In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2142

Carl Dixon,

Petitioner-Appellee,

v.

Donald I. Snyder,

Respondent-Appellant.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 2844--John A. Nordberg, Judge.

Argued January 10, 2001--Decided September 20, 2001



   Before Ripple, Kanne, and Williams, Circuit
Judges.

   Kanne, Circuit Judge.  This appeal raises
one crucial question: whether the
Illinois Appellate Court's determination
that Carl Dixon was not deprived of the
effective assistance of counsel in his
state court murder trial was unreasonable
in light of Strickland v. Washington, 466
U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d
674 (1984). We find that the court's
determination was unreasonable, and thus
affirm the order of the district court
granting Dixon's petition for a writ of
habeas corpus.

I.  History

   In an appeal from a ruling on a petition
for habeas relief, we review the district
court's findings of fact for clear error.
See Denny v. Gudmanson, 252 F.3d 896, 900
(7th Cir. 2001). Under the statutory
framework governing habeas review, "state
court factual findings are presumed to be
correct unless the petitioner rebuts the
presumption with 'clear and convincing'
evidence." Sanchez v. Gilmore, 189 F.3d
619, 623 (7th Cir. 1999), cert. denied
sub nom. Sanchez v. Schomig, 529 U.S.
1089, 120 S. Ct. 1724, 146 L. Ed. 2d 645
(2000); 28 U.S.C. sec. 2254(e). The
district court's opinion provided a

substantially more thorough discussion of the facts than either of the Illinois Appellate Court opinions. Compare Dixon v. Washington, No. 97 C 2844, 2000 WL 640885 (N.D.Ill. March 31, 2000) with People v. Dixon, 628 N.E.2d 399 (Ill. App. Ct. 1993) and People v. Dixon, No. 1-95-2761, slip op. (Ill. App. Ct. May 30, 1996). The district court did not determine that any of the state courts' factual findings were incorrect, it simply supplemented the factual discussions in the state court opinions after a review of the trial record. As we find the district court's discussion to be an accurate recitation of the facts in this case, we incorporate it here:

. . . Patrick Marshall [and] . . . Christopher Carlisle [were standing next to each other on the sidewalk] when a green car pulled up. A man got out and shot Marshall three times with a .25 caliber handgun. Marshall attempted to run away, but only made it a half of a block before collapsing and dying . . . .

Carlisle was standing next to the body when the first police officer arrived on the scene. He told the officer that his friend had been shot by a black male who got out of a car. Carlisle, however, did not identify the shooter by name. He then went to the police station at 103rd where he apparently stayed overnight and was interviewed by detectives investigating the case. Sometime the next day . . . he was interviewed by an assistant state's attorney named David Studenroth. After the interview, Carlisle signed a three-page statement . . . [identifying] Carl Dixon as the black male who shot Patrick Marshall. Specifically, the statement said that Dixon got out of the green car and asked Marshall, "where's my shit at." Marshall responded, "I'll get it to you, man," and Dixon then shot Marshall.
Dixon was indicted for first degree murder. He hired attorney William H. Wise (hereinafter, defense counsel) to defend him. Many months before trial, defense counsel learned that Carlisle--the only eyewitness against his client--was prepared to recant the May 12th statement he gave to the police. On January 26, 1991, Carlisle visited defense counsel's office and gave him an affidavit, in which Carlisle stated that "Carl Dixon was not the person [who] pulled the

trigger of [the] gun that killed" Patrick Marshall.

   Although defense counsel had a signed statement, he took the extra step of having Carlisle repeat his recantation in front of a court reporter. Two weeks later, on February 9, 1991, Carlisle returned to defense counsel's office and gave a court-reported statement. He again asserted that Dixon was not the shooter and further explained that he only signed the statement implicating Dixon because he had been held at the police station for 14 hours and was told he could go home if he signed it. Before trial, defense counsel assured his client that, because the State's main witness had recanted, there was no need to prepare a defense and no need for Dixon to testify.

Dixon, 2000 WL 640885, at *1 (footnote omitted).

   When the trial began on October 30, 1991, Dixon waived his right to a jury and a two-day bench trial took place. During trial, the state focused on an incident which it believed provided the motive for the murder. Ashadu McPherson, the victim's cousin, testified that on the evening of May 11th he was with Patrick Marshall, Dixon, and a group of other men. Dixon was showing off his new black 9 millimeter gun. When the gun was handed to Marshall, he ran away with it. Dixon then ran into his house and came out with a shotgun, which he put in the trunk of his car (a Monte Carlo with a red panel, according to one witness).

   Dixon drove around looking for Marshall for several hours, accompanied by McPherson, Charles Jemison, and another man. Dixon said that if he did not get his gun back he was going to have to do something to Marshall. McPherson's and Jemison's testimony about the ride was similar in most respects but conflicted on one key point: whether Dixon had a .25 caliber handgun with him (the police had located .25 caliber shell casings at the scene). McPherson testified that, at one point in the evening, he saw Dixon sitting in the driver's seat with a small handgun in his lap, which McPherson believed was either a .22 or .25 caliber handgun. Jemison, on the other hand, had been sitting in the front seat and testified that he did not see Dixon with

a handgun.

   The State's only direct evidence that Dixon killed the victim was Carlisle's May 12th statement. When called by the State, Carlisle testified that he did not know who had shot the victim. When specifically asked whether Carl Dixon was the man, Carlisle invoked his Fifth Amendment privilege against self-incrimination. When the trial judge ordered him to answer the question, Carlisle said that Dixon was not the man who shot Patrick Marshall.

   The State next attempted to question Carlisle about the May 12th statement that he signed at the police station. Carlisle admitted that he had been at the police station and had been interviewed by assistant state's attorney Studenroth. When asked whether he signed the statement, Carlisle again asserted his Fifth Amendment privilege. The trial judge allowed him to invoke it and prevented any further questioning about the statement. Counsel declined to cross-examine Carlisle but asked that the writ of habeas corpus be carried over for the next day of trial in case he wanted to use Carlisle as a rebuttal witness.

   On the second day of trial, the state called Studenroth, who testified that he interviewed Carlisle on May 12th and that Carlisle signed and initialed each page of the three- page statement Studenroth had written. When the State asked about the contents of the statement, the trial judge sustained defense counsel's objection and asked the State to tell him "under what theory of exception to the hearsay rule you are attempting to get this hearsay document into evidence." The State indicated that it was relying on Section 115-10.1 of the Illinois Code of Criminal Procedure.

   Section 115-10.1 is an Illinois statute which allows prosecutors to introduce prior inconsistent statements as substantive evidence rather than solely for impeachment purposes. 725 Ill. Comp. Stat. 5/115-10.1./1 "Passed by the Illinois legislature in 1984, Section 115-10.1 was an attempt to solve the problem of the 'turncoat witness,' who makes a statement to the police implicating the defendant but then comes to trial and recants." Dixon, 2000 WL

640885, at *8. Therefore, "even though the eyewitness recants at trial, the fact finder may nonetheless rely on the witness's earlier statement in order to convict the defendant." Id. This was a substantial change from the previous Illinois law, under which a prior inconsistent statement could only be used for impeachment. See, e.g., People v. Bryant, 447 N.E.2d 301, 305 (Ill. 1983) ("This court has repeatedly disapproved prosecutorial efforts to impart substantive character to prior inconsistent statements under the guise of impeachment."). Section 115-10.1 sets forth three foundational requirements that had to be met in order to admit Carlisle's prior inconsistent statement as substantive evidence: 1) the prior statement had to be inconsistent with the testimony at trial; 2) the witness had to be subject to cross-examination concerning the statement; and 3) the statement had to describe an event of which the witness had personal knowledge and had to be signed by the witness.

After the State indicated that it was relying on section 115-10.1 to admit the May 12th statement, the trial judge asked how the statement was inconsistent with Carlisle's in-court testimony. The State explained that, in court, Carlisle said that Dixon was not the shooter but his May 12th statement indicated that Dixon was the shooter. Counsel then objected, contending that the statement should not be considered as substantive evidence. Rather than arguing that one of the three statutory requirements had not been met, however, defense counsel relied upon an Illinois Supreme Court rule that was irrelevant and a case which predated the passage of section 115-10.1.

The trial judge interrupted defense counsel's arguments and told him that he was "still going to have to deal with 115-10.1." Counsel continued to argue that the State could not use the statement substantively because "[i]t's been the law in Illinois and still is." The trial judge again rejected his arguments, none of which addressed the statutory requirements, and ruled that the statement could come into evidence. Studenroth then resumed his testimony and explained that Carlisle identified Dixon as the man who got out of the car and shot Marshall. After minor stipulations,

the State rested. The defense did not recall Carlisle as a rebuttal witness. Instead, the defense rested without putting on any evidence. After closing arguments, the trial judge found Dixon guilty of first degree murder.

Defense counsel moved for a new trial. By this time, counsel apparently had been made aware of section 115-10.1, because he argued that the three foundational requirements for admitting a prior inconsistent statement under that section had not been met. In particular, he argued that Carlisle's invocation of the Fifth Amendment on direct rendered him unavailable for cross-examination. The State responded by noting that defense counsel never even attempted to question Carlisle. The trial judge denied the motion and sentenced Dixon to twenty years imprisonment.

On direct appeal, but still represented by the same counsel, Dixon alleged a number of errors, including that the May 12th statement should not have been admitted as substantive evidence because Carlisle was not available for cross-examination. The Illinois Appellate Court rejected this argument: "[d]efendant cannot claim a lack of opportunity to cross-examine Carlisle when he did not even attempt to call [him] to the stand." People v. Dixon, 628 N.E.2d 399, 404 (Ill. App. Ct. 1993). The court concluded that "defense counsel decided not to cross-examine [Carlisle] presumably because his testimony was favorable to defendant." Id. at 403. The appellate court also found that "[a]s defendant had the opportunity to cross-examine Carlisle, his right to confront witnesses was not violated." Id. at 404.

After exhausting his options on direct appeal,/2 Dixon engaged new defense counsel. On May 5, 1995, Dixon filed a two-count state court petition for post-conviction relief. This petition set forth the allegation now alleged in Dixon's habeas petition: that defense counsel "did not know or understand [section 115-10.1] and assumed throughout the trial that [Carlisle's] out-of-court statement had no substantive force and that the State had, therefore, completely failed to make its case." Dixon's Petition for Post-Conviction Relief at 1. In Count I, Dixon argued that defense

counsel was ineffective because he did not present a defense including, inter alia, the two statements Carlisle gave at defense counsel's office (the affidavit and the court-reported statement). In Count II, Dixon argued that counsel was ineffective for not cross-examining Carlisle. Both counts alleged that counsel acted as he did because he was not aware of section 115-10.1.

Dixon's post-conviction petition was dismissed as "frivolous and/or patently without merit" in a three-page order dated June 23, 1995. People v. Dixon, No. 90-CR-14327, slip op. at 1 (Cook County Circuit Court June 23, 1995). The court concluded, with respect to Count I, that defense counsel could not be considered ineffective for not presenting the affidavit and court-reported statement because they were inadmissable hearsay. As to Count II, the court noted that "[t]he inquiry into the competency of counsel will not generally extend to the exercise of judgment, discretion, trial tactics or strategy" and found that defense counsel's decision not to cross-examine Carlisle was reasonable "because his testimony was favorable to defendant." Id. at 2-3.

The Illinois Appellate Court affirmed the trial court's dismissal of the post-conviction petition. People v. Dixon, No. 1-95-2761, slip op. (Ill. App. Ct. May 30, 1996). In addressing Count I, the Illinois Appellate Court disagreed with the trial court's determination that Carlisle's recantations were inadmissable hearsay, finding that they could have been introduced to impeach the May 12th statement, pursuant to section 115-10.1. Id. slip op. at 12. The Illinois Appellate Court found, however, that Dixon was not prejudiced by counsel's failure to present the statements because "the trial court itself witnessed Carlisle recant" and thus these earlier recantations would not have changed the outcome of the trial. Id. at 14. As to Count II, the appellate court first cited a series of Illinois cases for the proposition that deciding whether to cross-examine a witness "is generally not an appropriate basis for a claim of ineffective assistance of counsel." Id. at 16. It then concluded that defense counsel "no doubt realized that Carlisle's direct testimony was extremely

damaging to the State and that he would not have benefitted his client by delving into a matter that may have raised the question of Carlisle's credibility." Id. The court reasoned that this decision was "perfectly sound trial strategy" and thus found no error in the trial court's dismissal of Count II of the petition. Id. at 16-17. On October 2, 1996, the Illinois Supreme Court denied Dixon's petition for leave to appeal.

Dixon subsequently filed a federal habeas corpus petition in the United States District Court for the Northern District of Illinois. That petition alleged that: 1) Dixon was denied the effective assistance of counsel when his defense counsel's ignorance of the governing law resulted in the admission of the sole piece of evidence relied upon to support Dixon's conviction; 2) Dixon was denied the effective assistance of counsel when defense counsel's ignorance of the law led him to decline to present a defense; and 3) the only possible way of justifying defense counsel's actions was to conclude that Carlisle's May 12 statement was, in fact, inadmissible because Carlisle's unavailability forconfrontation had already been demonstrated. See Petition for Writ of Habeas Corpus at 14, 17, 19. The district court granted Dixon's petition on the first two grounds. See Dixon, 2000 WL 640885, at *1. Respondent filed a timely notice of appeal and now asks us to reverse the grant of the petition.

II.  Analysis

Our review of Dixon's petition for habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996, ("AEDPA"), 28 U.S.C. sec. 2254, because Dixon filed his petition for habeas relief after the effective date of that Act. AEDPA provides that habeas relief may be granted if a state court's adjudication of a matter "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. sec. 2254 (d)(1). A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law"

or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that reached by the Supreme Court]." Williams v. Taylor, 529 U.S. 362, 405, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)./3 An "unreasonable application" of Supreme Court precedent occurs when "the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407; see also Jackson v. Miller, No. 98-3736 2001 WL 884814 (7th Cir. Aug. 8, 2001). We review a state court decision de novo to determine whether it was "contrary to" Supreme Court precedent; however, we defer to reasonable state court decisions. See Ouska v. Cahill-Masching, 246 F.3d 1036, 1044 (7th Cir. 2001). Further, in reviewing a district court's grant of a petition for habeas relief, we review the district court's determinations de novo and its factual determinations for clear error. See Denny v. Gudmanson, 252 F.3d 896, 900 (7th Cir. 2001). In order to issue a writ of habeas corpus, the state court decision must be both "incorrect and unreasonable." Washington v. Smith, 219 F.3d 620, 628 (7th Cir. 2000).

  Dixon's petition alleges that the Illinois Appellate Court's determination that he was not deprived the effective assistance of counsel in his state court murder trial was unreasonable in light of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The rule set forth in Strickland is "clearly established Federal law," see Williams, 529 U.S. at 390; Washington, 219 F.3d at 628, and provides that a petitioner claiming the ineffective assistance of counsel must establish that: 1) "counsel's representation fell below an objective standard of reasonableness" and 2) "the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687-88. Dixon did not raise this claim on direct appeal, and he was not required to. People v. Gaines, 473 N.E.2d 868, 875 (1984) ("It

would be unreasonable to expect appellate counsel to convincingly raise and argue his own incompetency.")./4 We must now determine whether the Illinois Appellate Court, in reviewing Dixon's post-conviction petition, unreasonably determined that Dixon's defense counsel was not ineffective for counsel's failure to present impeachment evidence (i.e., Carlisle's recantations) or to cross-examine Carlisle after Studenroth's testimony about the May 12th statement./5 Only "[a] clear error in applying Strickland's standard would support a writ of habeas corpus." Holman v. Gilmore, 126 F.3d 876, 882 (7th Cir. 1997). We address each of Strickland's two prongs in turn.

A.   Whether Counsel's Representation Fell Below an Objective Standard of Reasonableness

   The Illinois Appellate Court found that it was "perfectly sound trial strategy" for counsel to decide not to cross-examine Carlisle, though it did not determine whether counsel's failure to present impeachment evidence was unreasonable (it found that, even if it was unreasonable, Dixon was not prejudiced). We review both issues de novo, but the former with "a grant of deference to any reasonable state court decision." Schaff v. Snyder, 190 F.3d 513, 522 (7th Cir. 1999). The Sixth Amendment requires "reasonably effective assistance," Strickland, 466 U.S. at 687, the purpose of which is "to ensure that criminal defendants receive a fair trial." Id. at 689. Determining whether counsel performed reasonably is undoubtedly a deferential inquiry. A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. Dixon attempts to overcome this presumption by arguing that defense counsel was not aware of section 115-10.1--the Illinois statute permitting prior inconsistent statements to come in as substantive evidence once certain requirements are met--and therefore his actions at trial were inherently constitutionally deficient. See Strickland, 466 U.S. at 691 (noting that "counsel has a duty to

make reasonable investigations").

After reviewing the record, the district court determined that counsel could not have been aware of section 115.10-1 at the time of trial. The court summarized the events as follows:

After the State indicated that it was relying on sec. 115-10.1, the trial judge asked how the prior statement was inconsistent with the in-court testimony. The State explained that Carlisle on direct said Dixon was not the shooter and in the statement he said that he was. Defense counsel then interrupted and argued that the statement should not be considered as substantive evidence. Rather than arguing that one of the three statutory requirements had not been met, as you might expect him to do, counsel instead relied upon a separate Illinois Supreme Court rule and case--neither of which had any direct relevance to sec. 115-10.1. Counsel first said that the "controlling" rule in this case was Illinois Supreme Court Rule 238, which discusses under what circumstances a party may attempt to cross-examine its own witness. The trial judge interrupted this argument and told defense counsel that he should address the statute cited by the State: "First, before you get into [Rule 238], you're still going to have to deal with 115-10.1."

Rather than heeding the trial judge's directive, defense counsel then cited to an Illinois case, People v. Bryant, for the proposition that a prosecutor may not try to "impart substantive character to prior inconsistent statements under the guise of impeachment." He explained that there was "no question" that the State was trying to introduce the May 12th statement under the "guise of" impeachment because the State had no other way to introduce direct evidence against the defendant. Defense counsel insisted that the State could not use the statement substantively because "[i]t's been the law in Illinois and still is."

The trial judge rejected these arguments and ruled that the statement could come into evidence. [Yet counsel continued to] ask[ ] that the State explain how it was using the prior statement.

Dixon, 2000 WL 640885, at *4. The

district court concluded that counsel must not have been aware of the "new" statute and was instead operating under the assumption that the statement could only come in for impeachment purposes, as under the prior law. The court also found that there was no reason for counsel not to have been familiar with the statute: it had been in effect for seven years prior to trial and counsel knew more than eight months before trial that the sole eyewitness had recanted (thus, the court reasoned, he should have investigated the law concerning prior inconsistent statements).

Yet, as the district court noted, Strickland focuses on whether an attorney's performance was deficient, not on whether he was perfectly knowledgeable about the law. Dixon, 2000 WL 640885, at *10-11. Indeed, a defendant must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland, 466 U.S. at 690. The district court thus examined Dixon's arguments--that counsel should have cross-examined Carlisle and that he should have introduced the recantations into evidence--as if Dixon was making the broader assertion that "his counsel's ignorance caused him to engage in a fundamentally flawed trial strategy." Dixon, 2000 WL 640885, at *11. The court found that counsel did engage in such a strategy--indeed, counsel did not even put on a defense--thus satisfying Strickland's first prong. Id. at *10-13.

Subsequent to the district court's decision, however, the Supreme Court clarified the role of federal courts conducting habeas review. See Williams, 529 U.S. at 405. Under the provisions of AEDPA, a federal court may not "issue the habeas writ unless the state court was wrong as a matter of law or unreasonable in its application of law to a given case." Id. at 385. Thus we must examine whether the Illinois Appellate Court's determination that counsel's performance was not deficient--finding that it was "perfectly sound trial strategy" for counsel to decide not to cross-examine Carlisle--was an unreasonable application of Strickland. See 28 U.S.C. sec. 2254. Because the Illinois court did not decide whether counsel's failure to present rebuttal evidence fell below the required

level of performance, we may consider that issue without any deference to the state court's conclusions.

The Illinois Appellate Court's opinion stated that deciding whether or not to cross-examine a witness "is generally not an appropriate basis for a claim of ineffective assistance of counsel." People v. Dixon, No. 1-95-2761, slip op. at 16 (Ill. App. Ct. May 30, 1996). Notwithstanding the fact that Dixon argued in his petition for post-conviction relief that his defense counsel was not aware of section 115-10.1 and "assumed through the trial that the out-of-court statement had no substantive force," the Illinois court did not even consider this argument. It instead reasoned that defense counsel "no doubt realized that Carlisle's direct testimony was extremely damaging to the State and that he would not have benefitted his client by delving into a matter that may have raised the question of Carlisle's credibility." Id. The court concluded that this was "perfectly sound trial strategy." Id.

It seems very likely that the district court was correct in finding that counsel was not aware of section 115-10.1. Indeed, the appellant has conceded that counsel was unaware of it. If counsel was unaware of the statute, then his decision not to cross-examine Carlisle cannot be accorded the same presumption of reasonableness as is accorded most strategic decisions because it was not based on strategy but rather on a "startling ignorance of the law." Kimmelman v. Morrison, 477 U.S. 365, 385, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). While it might have been reasonable for counsel to have acted as he did if the law had not changed, the law had in fact changed drastically. The Illinois Appellate Court's opinion did not dismiss the possibility that counsel was not aware of the statute, yet it nonetheless analyzed counsel's actions as if the only issue was whether counsel should have cross-examined a witness. This analysis ignored the fact that counsel's decision not to cross-examine Carlisle would not have been reasonable if counsel was completely unaware of the legal effects of his failure to cross-examine Carlisle. If counsel had been aware of section 115-10.1 he would have known that, to prevent

the May 12th statement from coming in as substantive evidence, Carlisle had to be shown to be unavailable for cross-examination. The only way to do this was to attempt to cross examine Carlisle so that he could take the Fifth, as he had done consistently on direct examination./6

We thus determine that, assuming counsel was unaware of the statute, it was unreasonable under Supreme Court precedent for the Illinois Appellate Court to conclude that the decision not to cross-examine was a decision that could be considered "sound trial strategy." Even if counsel was aware of the statute (and all indications are that he was not), it would still have been an unreasonable trial strategy to decide not to attempt to render the sole piece of direct evidence against your client inadmissable, even if you were not certain you would be successful. Indeed, it would have been even more unreasonable for counsel to have made the decision not to cross Carlisle if he had been aware of the statute and equally unreasonable for the appellate court to have found it to be a reasonable strategic decision.

As for defense counsel's decision not to present Carlisle's previous recantations, the Illinois courts did not rule on this issue thus we may determine, de novo, whether counsel's actions fell below the permissible level of performance. We find that there was no rational explanation for why counsel did not introduce Carlisle's two recantations as evidence. There was absolutely no risk in doing so. It seems clear that defense counsel did not think he had to put on a defense because he was certain that the May 12th statement could not come in as substantive evidence.

We thus find that the Illinois Appellate Court unreasonably concluded that counsel was not ineffective for deciding not to cross-examine Carlisle; we also find that it was unreasonable for counsel not to introduce the statements. Yet Strickland requires us to determine whether the defendant was prejudiced by counsel's deficient performance. We turn to that inquiry now.

B.  Whether Counsel's Deficient Performance Prejudiced the Defense

The Illinois Appellate Court determined that, even if Dixon's counsel was deficient, Dixon was not prejudiced. We review this determination as we did the first prong: to determine whether the state court decision was contradictory to or unreasonable in light of Strickland. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. 694. If "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt," then we must find prejudice. Id. at 695. To determine "whether . . . the result of the particular proceeding is unreliable . . . [we] consider the totality of the evidence . . . . [A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id.

Dixon was convicted on a record so weak that the trial judge spoke directly to the issue:

"[A]bsent Carlisle's impeachment there is no evidence connecting [Dixon] with the acts which led to the death of Mr. Marshall. There is no direct evidence. There is circumstantial evidence. But that circumstantial evidence . . . just goes to [showing] the existence [of] motive, and the fact that Mr. Dixon was looking for the deceased after the events in that school yard.

Report of Trial Proceedings at B33 (Oct. 31, 1991). After determining that Illinois law permitted Carlisle's May 12th statement to come in as substantive evidence, the court proceeded to sentence the defendant with the following analysis: "[the May 12th statement] stands unimpeached other than the fact that Mr. Carlisle is a convicted felon [thus] taken along with the other evidence in this case . . . the court is going to enter a finding of guilty." Id. at B35.

Given our determination that counsel was deficient for not cross-examining Carlisle (to attempt to establish his

unavailability) and for introducing Carlisle's pre-trial recantations, we agree with the district court that there is a reasonable probability that the outcome would have been different had counsel not been deficient. First of all, notwithstanding the appellant's protestations, it is reasonably likely that had Carlisle been cross-examined by Dixon's defense counsel, Carlisle would have invoked his Fifth Amendment privilege. He did so on direct examination on the advice of his own counsel, and, during the course of Dixon's appeal, Carlisle provided an affidavit stating that he would have invoked the privilege on cross (of course, counsel did not have the benefit of this affidavit at trial). Even if Carlisle had not taken the Fifth, or if the trial judge had not permitted him to do so, Carlisle had already provided Dixon's defense counsel with two signed statements indicating why the May 12th statement was not true, and he would likely have explained this again on the stand.

Further, even if Carlisle had not taken the Fifth on direct, or had not explained why the May 12th statement was false, defense counsel still had the ability to impeach the May 12th statement by introducing Carlisle's pre-trial recantations. There is a very reasonable probability that the judge would not have entered a finding of guilty had the statement--the sole direct evidence of guilt--been impeached. It is true that the judge did hear Carlisle's trial testimony denying many of the facts contained in the May 12th statement; however, counsel did not explain the reason for Carlisle's inconsistency and the judge drew a logical conclusion: that Carlisle's recantation at trial was not credible. See Washington, 219 F.3d at 634 (noting that the credibility of the defense's sole witness "was impaired because of his prior convictions"). Had the judge known that Carlisle's statement--indicating that he saw Dixon kill the victim--was signed after Carlisle had been detained by the police for fourteen hours, and after he was told that he would be charged with the murder if he did not sign the statement, the recantation might have seemed more credible. Carlisle had already given two signed recantationsprior to trial, one of

which was court reported, explaining the recantation. Impeaching the May 12th statement with Carlisle's later recantations would likely have added "substance and credibility" to Carlisle's trial testimony, id., not to mention that an in-court statement is typically entitled to greater weight than an out-of-court statement such as the May 12th statement. Thus, if Carlisle's statement had not come in as substantive evidence, there would have been no direct evidence--and only very slim circumstantial evidence--connecting Dixon to the murder.

We thus find that there is a reasonable doubt that, absent defense counsel's errors, the trial judge would have had a reasonable doubt respecting Dixon's guilt. See Strickland, 466 U.S. at 695.

C. Confrontation Clause

As we have already determined that the petition should be granted under Dixon's ineffective assistance of counsel claim, we need not analyze the claim that Carlisle was unavailable for confrontation.

III. Conclusion

For the above stated reasons, we find that the Illinois Court of Appeals' determination that Carl Dixon was not deprived the effective assistance of counsel was the result of an unreasonable application of clearly established Supreme Court precedent. We therefore AFFIRM the decision of the district court to grant Dixon's petition for a writ of habeas corpus. Petitioner is ordered to be released from custody unless the State of Illinois grants him a new trial within 120 days from the issuance of this opinion.

FOOTNOTES

/1 At the time of trial the statute was Ill. Rev. Stat. 1989, ch. 38, para. 115-10.1.

/2 Dixon filed a petition for leave to appeal with the Illinois Supreme Court, which was denied on April 6, 1994. On November 7, 1994, the United States Supreme Court denied his petition for certiorari.

/3 The district court's opinion was issued on March 29, 2000, prior to the April 18th issuance of the

Court's decision in Williams.

/4 Indeed, the Illinois Appellate Court recognized, in its opinion denying post-conviction relief, that "the issue of a trial counsel's competency is [not waived] for purposes of post-conviction relief . . . when defendant's trial counsel also represents that defendant on direct appeal." People v. Dixon, No. 1-95-2761, slip op. at 5 n.2 (Ill. App. Ct. May 30, 1996) (citing, inter alia, People v. Sanchez, 662 N.E.2d 1199, 1207 (Ill. 1986)).

/5 Dixon's habeas petition frames the issues slightly differently than how they were presented in his petition for post-conviction relief but for ease of review of the Illinois Appellate Court's opinion, we review the issues in the context presented there.

/6 We address appellant's argument that Carlisle would not have invoked the Fifth Amendment, and thus that the statement would have come in regardless, infra.