# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-3622

RONALD BARROW,

*Petitioner-Appellant,*

v.

ALAN UCHTMAN, **Warden**,

*Respondent-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 9152—**Amy J. St. Eve**, *Judge.*

_____

ARGUED NOVEMBER 1, 2004—DECIDED FEBRUARY 15, 2005

_____

Before CUDAHY, ROVNER and WOOD, *Circuit Judges.*

PER CURIAM. Petitioner Ronald Barrow, serving a life sentence for murder in an Illinois correctional facility, appeals the district court's denial of his habeas corpus petition under 28 U.S.C. § 2254. Barrow alleges, *inter alia*, that since his trial counsel failed to present any evidence in defense and committed several other errors during state proceedings, he was denied effective assistance of counsel in violation of his rights under the Sixth Amendment to the United States Constitution. Barrow claims that the Illinois Supreme

Court's determination that his trial counsel's performance (1) was not objectively deficient and (2) did not prejudice Barrow constituted an unreasonable application of Supreme Court precedent. The district court found these contentions unpersuasive. We affirm.

## I. BACKGROUND

The facts of Barrow's underlying conviction are largely undisputed. After a jury trial in the circuit court of LaSalle County, Illinois, Barrow was found guilty of murder, armed robbery, residential burglary and burglary on June 3, 1985. The following factual evidence—which would prove crucial to both Barrow's state conviction and the district court's denial of his later habeas claims of ineffective assistance of counsel—was presented at trial.[1]

On February 19, 1984, the body of the victim, Joseph O'Berto, was discovered in the basement of his residence located in Cedar Point, Illinois. He had been shot in the head, and investigating officers found a spent projectile which police forensic scientists determined could have been fired from a 9 millimeter-caliber gun. Several of the stairs leading to the victim's basement had been "torn up," and the basement also contained an empty safe and three slot machines. There were no signs of forced entry into the victim's home. Darlene Brown, the victim's daughter, had discovered the body of the victim lying in the basement in a pool of blood the morning after the murder. Brown testified that she found the front door to the victim's residence unlocked

---

[1] The facts in this section are taken principally from the Illinois Supreme Court's affirmance of Barrow's conviction on direct appeal, *People v. Barrow*, 133 Ill.2d 226, 238-45, 549 N.E.2d 240 (1989), and the Illinois Supreme Court's denial of Barrow's subsequent petition for post-conviction relief, *People v. Barrow*, 195 Ill.2d 506, 512-17, 749 N.E.2d 892 (2001).

and that several rooms in the house were in disarray. She also determined that a number of her father's possessions were missing, including his wallet (which she said typically contained about $500 in denominations of $100), a bankbook with $20,000 on deposit and a gold money clip.

On March 15, 1984, Illinois State Police were contacted by Judy Herron, who informed them that her boyfriend, Harold "Smokey" Wrona, who was incarcerated in a Maryland State prison, had information concerning the victim's death and wished to meet with police. The police met with Wrona and, based on information that he provided them, they made arrangements with Maryland law enforcement officials to have Wrona released from prison so he could meet with Barrow and provide an opportunity for Barrow to make incriminating statements that could be recorded with police surveillance equipment. On April 6, 1984, Wrona and Barrow met in a hotel room in Maryland which was equipped with hidden audio and video equipment operated by Maryland law enforcement officials. After Barrow made a number of incriminating statements to Wrona, he was arrested and charged with the offenses indicated above.

At trial, the State's star witness against Barrow was Wrona. Wrona testified that he met the defendant in July of 1983, while they were incarcerated in the same cellblock at a Maryland prison. According to Wrona, he told Barrow that in 1966 two of his friends had burglarized a home in Cedar Point, Illinois and stole $64,000 that they found under a step of the basement stairs. Wrona stated that his friends told him they also found three "barrels of change" in the basement but took only the cash, and they later discovered that an additional $175,000 was hidden under one of the lower steps of the basement stairs where they had not searched. Wrona further testified that on February 2, 1984, after Barrow was released from prison on bond pending an appeal of a Maryland conviction for armed robbery, Barrow visited Wrona in prison. At that time he told Wrona that he

was going to Davenport, Iowa, because he had a "score" there and wanted to visit Wrona's son on the way. The defendant also inquired about the robbery of the man in Cedar Point that Wrona had told him about earlier. He sought directions to Cedar Point and asked Wrona whether he knew what the burglarized house looked like.

According to Wrona's testimony, Barrow again visited him in prison on February 24, 1984, reporting that he had made "a pretty good score" in Cedar Point. Barrow said he and his brother Bruce had watched the victim's home for about a week, and that late one night he had knocked on the front door, told the victim that he was having car trouble, stuck his foot in the door and pushed the victim back into the house with a gun and handcuffed him. Barrow reported finding a wallet in the victim's pocket which contained five $100 bills, and he searched the house and found a bankbook showing $18,000 on deposit. In the basement, Barrow reported finding an empty safe and three slot machines covered with plastic. Barrow also stated that he and his brother "tore a couple stairs up" but did not find anything. In addition, Barrow said that he asked the victim where the money was but the man could not hear so he "whipped him." While pointing a finger to his head, Barrow told Wrona that he "had to take him [the victim] out of it." Wrona testified that Barrow said he and his brother wore gloves during the course of the crime and that he disposed of the gun in a river in Indiana just prior to being stopped by an Indiana State trooper for speeding.

The most crucial piece of evidence was the recording of Barrow's conversation with Wrona in the Maryland hotel room, which had been monitored by police surveillance equipment and was played for the jury at trial. A transcript of the recording was also received into evidence. The transcript shows that Barrow told Wrona that "everything went just like . . . we had planned it." Barrow said he watched the victim's home for a week and that late one evening, after

midnight, he forced his way into the victim's house. Barrow stated that although he hit the victim "all over," O'Berto would not tell him anything except "where he kept change." Barrow said he searched everywhere and found only an empty safe in the basement. Barrow also stated that he "pulled up" the first two stairs leading to the basement but did not find any money. Wrona asked the defendant what kind of gun he used and the defendant replied that it was a "hot, nine mil[limeter]" which he had obtained in Delaware. The defendant added that he had tossed the gun off a bridge on his way back from Cedar Point.

The State presented abundant evidence demonstrating that Barrow and his brother were in the Cedar Point area driving a rented white Ford Thunderbird immediately before and after February 18, 1984.[2] Barrow and his brother

---

[2] This evidence included testimony from Judy Herron (Wrona's girlfriend), indicating that Barrow and his brother, driving a white car, had visited her home in Seatonville, Illinois twice during this period; testimony from Patricia Hurley, an employee of Budget Rent-A-Car in Newark, Delaware, to the effect that on February 11, 1984, Barrow rented a white Ford Thunderbird bearing license plate number 744741; testimony from a clerk of the Holiday Inn motel in Peru, Illinois who testified that on February 13, 1984, the defendant checked into room 123 with a second man and checked out on February 19, the morning after O'Berto's murder; the testimony of Kathleen Noll, a LaSalle County police officer, indicating that on February 16, 1984, at approximately 4:45 a.m., she observed Bruce Barrow driving a white Ford Thunderbird with Delaware license plate number 744741, heading the wrong way down a one-way street in downtown LaSalle, Illinois; a tape recording of phone calls made by Bruce Barrow to the defendant after being stopped and arrested by officer Noll for this traffic offense; testimony from a worker at a Cedar Point restaurant patronized by Bruce Barrow at approximately 10 p.m. on February 18, 1984; testimony of Curtis Barmes, an Illinois State trooper, indi-

(continued...)

were driving this same model and make of car when they were stopped by an Indiana state trooper for speeding the day after the murder. The prosecution also presented evidence to link a pair of Barrow's shoes, found in a search of his home in Maryland, to the impression of a shoe recovered from a piece of plywood found in the victim's basement. A police forensic scientist stated that the shoes found in the defendant's apartment "could have made the footwear impressions" considering that the size and the pattern of the sole of the shoes matched those exhibited on the impression. On the heel of the left shoe was found a small bloodstain which contained human blood type O. Both the defendant and the victim were blood type O as well (as is 45% of the white, male population of the United States).

During the trial, Barrow's attorney presented no evidence whatsoever in defense, apparently believing—erroneously—that the submission of any evidence would waive error on a later motion for a directed verdict. *Barrow*, 133 Ill.2d at 247-48. Barrow's attorney may also have had other motivations for this decision, but the record is not entirely clear on this point. *Id.* In any event, both parties agree that counsel's failure to present evidence in defense was based, in large part, on his misunderstanding of Illinois law.

---

[2] (...continued)
cating that on February 18, 1984, at approximately 1:55 a.m., he observed a white Ford Thunderbird with Delaware license plates number 744741 heading north on Route 51 at a point south of the Illinois River bridge near Cedar Point; testimony of Dave Doll, an Indiana State trooper, indicating that on February 19, 1984, at approximately 5:07 a.m. Eastern Standard Time, he stopped Barrow and another man for speeding in a white Ford Thunderbird heading east on the Indiana Toll Road.

As part of this strategy of silence, Barrow's counsel declined to put Barrow or his brother on the stand.[3] Barrow's lawyer did cross-examine the State's star witness, convicted felon Smokey Wrona, though Barrow contends that counsel did so ineptly since he failed to ask any questions about Wrona's (many) prior convictions. Barrrow further asserts that counsel did not adequately exploit inconsistencies in government evidence, did not adequately investigate or present certain evidence and failed to object to improper evidence and argument presented by the State.

At the conclusion of the trial, the jury found Barrow guilty of murder, armed robbery, residential burglary and burglary. The State asked for the death penalty, and after the first stage of the sentencing hearing, the jury found that Barrow was subject to the death penalty since he was over 18 years of age at the time of the murder and had killed the victim in the course of a felony (armed robbery). The trial court sentenced Barrow to death for the murder conviction, plus a consecutive 30-year prison term for the armed robbery conviction and a 15-year term for the residential burglary conviction.

Barrow's conviction was affirmed by the Illinois Supreme Court on direct appeal. *People v. Barrow*, 133 Ill.2d 226, 549 N.E.2d 240 (1989) (*Barrow I*). The Illinois Supreme Court later denied Barrow's petition for post-conviction relief, rejecting his arguments regarding ineffective assistance of counsel as alternatively procedurally barred and/or without substantive merit. *People v. Barrow*, 195 Ill.2d 506, 749 N.E.2d 892 (2001) (*Barrow II*).

---

[3] Barrow claims that counsel promised the jury it would hear testimony from both Barrow and his brother. However the trial transcript reveals no such explicit promise. Barrow's lawyer merely assured the jury that evidence would be presented, and that Barrow had an explanation of the night in question that "we will tell you about." (R. at 1863-72.)

Barrow then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 with the district court for the Northern District of Illinois on June 3, 2002, and while the petition was pending, Barrow's death sentence was commuted to natural life in prison by the executive clemency action of Governor George Ryan on January 11, 2003. The district court subsequently denied Barrow's habeas petition, *U.S. ex rel. Barrow v. McAdory*, 2003 WL 21920258 (N.D. Ill., Aug. 12, 2003), holding that the Illinois Supreme Court's rejection of Barrow's ineffective assistance claims did not involve an unreasonable application of federal law under 28 U.S.C. § 2254(d). The district court denied Barrow's Motion for Issuance of a Certificate of Appealability. *Barrow v. McAdory*, 2003 WL 22282520 (N.D. Ill., Sept. 29, 2003).

We granted Barrow's Motion for a Certificate of Appealability on the limited issue of whether Barrow received ineffective assistance of counsel, determining that Barrow had made a substantial showing of a constitutional violation as required by 28 U.S.C. § 2253(c)(1)(B)(2). (2/2/04 Order, App. B at 37.) Barrow now appeals the district court's denial of his habeas petition.

## II.  JURUSDICTION

The district court had jurisdiction over Barrow's habeas petition pursuant to 28 U.S.C. § 2254. The district court denied Barrow's petition and subsequently denied his Motion for a Certificate of Appealability on September 29, 2003. This Court then granted Barrow's Motion for a Certificate of Appealability on February 2, 2004. Accordingly, we now have jurisdiction pursuant to 28 U.S.C. § 2253(c).

### III.  STANDARD OF REVIEW

We review the district court's denial of a habeas petition *de novo* and its findings of fact for clear error. *Denny v. Gudmanson*, 252 F.3d 896, 900 (7th Cir. 2001); *Dixon v. Snyder*, 266 F.3d 693, 695 (7th Cir. 2001).

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), a federal court will not grant a writ of habeas corpus to a state prisoner with respect to any claim adjudicated on the merits in state court unless the state decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1-2) (2003). *See also Williams v. Taylor*, 529 U.S. 362, 402-03 (2000).

A state decision is "contrary to" clearly established federal law if the state court applies the incorrect rule of law or confronts facts that are materially indistinguishable from a relevant Supreme Court case and arrives at the opposite result. *Id.* at 405-06. A state decision involves an unreasonable application of Supreme Court precedent if it identifies the correct governing legal rule but applies that rule unreasonably to the facts of a particular case. *Id.* at 407-08. This reasonableness determination is quite deferential, such that a state decision may stand as long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect. *Id.* at 411-12. *See also Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (state court determination may not be overturned simply because it is incorrect); *Dixon*, 266 F.3d at 700 (the state court decision must be both incorrect and unreasonable to be overturned); *Hall v. Washington*, 106 F.3d 742, 748-49 (7th Cir. 1997) (state decision may stand as long as it is one of several reasonable outcomes). Additionally, a state court's determination of factual issues

is presumed correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1) (2003).


## IV. DISCUSSION

Claims for ineffective assistance of counsel are evaluated under the now-familiar two-pronged test outlined in *Strickland v. Washington*, 466 U.S. 668 (1984).[4] First,

---

[4] Both parties and all the courts below have proceeded on the assumption that Barrow's claims are governed by the *Strickland* standard. Barrow does not argue for application of a different legal test. However, we note at the outset that counsel's extreme failings at trial come perilously close to triggering the rule outlined in *United States v. Cronic*, 466 U.S. 648 (1984). In *Cronic*, handed down the same day as *Strickland*, the Supreme Court ruled that in certain cases a lawyer's failures are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Id.* at 658. In other words, in the most extreme instances of lawyerly incompetence, courts may do away with *Strickland*'s second "prejudice" prong altogether. The Supreme Court has offered three examples of such an extreme case: (1) where the accused is "denied the presence of counsel at a critical stage" in proceedings, (2) where counsel "*entirely fails to subject the prosecution's case to meaningful adversarial testing*" or (3) where "counsel is called upon to render assistance under circumstances where competent counsel very likely could not." *Bell v. Cone*, 535 U.S. 685, 695-96 (2002) (citing *Cronic*, 466 U.S. at 659-62) (internal quotations omitted) (emphasis added). In such cases, "the defendant need not show that the proceedings were affected [by counsel's errors]*." Id.* at 696.

In the instant case, given that Barrow's attorney adduced no evidence in defense (including no oral witness testimony), it could certainly be argued that Barrow's counsel "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing*."* However, this characterization is not supported by the Supreme

(continued...)

defendant must show that the performance of counsel fell outside the "range of competence demanded of attorneys in criminal cases"—i.e., that it "fell below an objective standard of reasonableness." *Id.* at 687-88 (quotations omitted). Under this first "performance" prong, courts are to "indulge a strong presumption" of competence such that "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound

---

[4]  (...continued)

Court's subsequent applications of *Cronic.* For example, in *Bell*, the Court rejected a habeas petitioner's argument that his lawyer failed the *Cronic* standard by declining to present a case in response to evidence offered by the prosecution at a sentencing hearing. *Id.* at 696-98. The Court explained its decision as follows:

> When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be complete . . . . Here, respondent's argument is not that his counsel failed to oppose prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points.

*Id.* at 696-97. This holding is in accord with other Supreme Court precedents where attorney failure to adduce evidence at sentencing was evaluated under *Strickland* rather than *Cronic. See, e.g.*, *Burger v. Kemp*, 483 U.S. 776, 788 (1987); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986).

Of course, counsel's failings in the instant case occurred at trial rather than at a sentencing hearing, and thus they may be considered more grievous. Nonetheless, like the lawyer at issue in *Bell*, Barrow's attorney did not fail to take action altogether—at the very least he presented opening and closing arguments, and he cross-examined the State's witnesses (however inexpertly). Thus in light of *Bell* it is most apt to say that counsel's failure was not complete, but occurred "at specific points" in the proceeding. As such, we are satisfied that *Strickland* is the appropriate governing precedent.

trial strategy." *Id.* at 689 (quotations omitted). Under the second prong of the test, the defendant must demonstrate prejudice—"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In its affirmance of Barrow's conviction on direct appeal, the Illinois Supreme Court rejected Barrow's ineffective assistance claims, stating that, under the legal test outlined in *Strickland*, "there is a strong presumption that the challenged action of counsel was the product of sound trial strategy and not of incompetence" and concluding that, in Barrow's case, "[w]e cannot say that the defendant has overcome this presumption." 133 Ill.2d at 247. Later in the opinion, the court hedged its bets somewhat, stating that, given the "overwhelming" evidence of Barrow's guilt—including a recorded confession—"[w]e cannot say that the criticized conduct of counsel, even if considered inadequate, was sufficient so to judge that there was a reasonable probability that, but for counsel's fault, the result of the trial would have been different." *Id.* at 250.

Upon considering Barrow's petition for post-conviction relief, the Illinois Supreme Court initially disposed of most of Barrow's claims under the doctrines of *res judicata* or waiver. 195 Ill.2d at 519-23. The court also seemed to back off from its earlier assertion that Barrow's trial counsel was objectively competent under the first prong of *Strickland*, emphasizing instead its belief that because of the "overwhelming" evidence of Barrow's guilt, he had failed to demonstrate the requisite prejudice. Speaking to the cumulative effects of counsel's alleged errors, the court concluded that "[e]ven if we were to find that counsel's performance was deficient, there is no reasonable probability that, but for counsel's performance, the result of the trial would have been different, given the substantial amount of evidence of the defendant's guilt." *Id.* at 525.

In its denial of Barrow's habeas petition below, the district court addressed a multitude of grounds for the ineffective assistance claim, only some of which are raised here. The district court first concluded that many of Barrow's claims were procedurally defaulted since they were not raised before the Illinois Supreme Court. 2003 WL 21920258, at *21-26. With respect to those claims that were not procedurally defaulted, the district court correctly noted that the Illinois Supreme Court had identified the proper governing rule of law—the *Strickland* test—and it concluded that the Illinois Court had not applied the *Strickland* standard unreasonably within the meaning of AEDPA, 28 U.S.C. § 2254(d): "Only clear error in applying *Strickland* can support a writ of habeas corpus. The Illinois Court did not err in its application of *Strickland*." *Id.* at *26 (citation omitted).

In the instant appeal, Barrow advances seven distinct failings by his trial counsel that, he claims, entitle him to relief: (1) that counsel failed to present any evidence in his defense at trial; (2) that counsel was not diligent in investigating and challenging the state's evidence, especially shoe-print and fingerprint evidence; (3) that counsel did not impeach or adequately cross-examine Smokey Wrona, the State's star witness; (4) that counsel promised to present testimony in defense—including testimony from Barrow himself—and failed to do so; (5) that counsel actually asked jurors to credit the testimony of state witness Smokey Wrona; (6) that counsel failed to adequately cross-examine Wrona about the recorded conversation he had with Barrow in which Barrow incriminated himself; and (7) that counsel failed to contest or object to the State's presentation of certain misleading evidence. Barrow also claims that the cumulative impact of these errors is sufficient to warrant a reversal of his conviction. The district court treated some of these claims as procedurally defaulted and reached the merits of others, but such procedural distinctions are ultimately immaterial to our disposition of the instant

appeal. The end result is the same even assuming that all of Barrow's claims are eligible for review on the merits.

Barrow's most basic ground for his claim—one that arguably subsumes most of his other more specific grounds—concerns his lawyer's failure to introduce evidence at trial. Both parties acknowledge that Barrow's counsel presented no evidence whatsoever in defense, and that this tactic (if it may be so called) was motivated at least in part by counsel's erroneous understanding of Illinois law concerning directed verdicts. Both parties also agree that the Illinois Supreme Court correctly identified the *Strickland* test as the legal rule governing Barrow's ineffective assistance claims. The only issue is whether the Illinois court applied this rule unreasonably under 28 U.S.C. § 2254(d).

As to the first prong of the *Strickland* test, we take issue with the Illinois Supreme Court's initial determination that trial counsel's performance was reasonably competent. *See* 133 Ill.2d at 247. The government tries to justify counsel's failings by arguing that the decision not to present evidence was a carefully considered "tactical" or "strategic" move, pointing out that counsel's misunderstanding of Illinois law concerned subtle procedural distinctions. Nonetheless, the government acknowledges that counsel's decision not to present any evidence was based in large part on a clear error of law, and the government's invocation of "tactics" or trial strategy cannot obscure the fact that counsel erroneously failed to present *any* exculpatory evidence—in a capital case no less. Without indulging in Barrow's more pejorative characterizations of this failure,[5] it is enough to note that this Court has previously held such basic legal mistakes to fail *Strickland*'s first objective performance prong. *See Moore v. Bryant*, 348 F.3d 238, 241-42 (7th Cir.

---

[5] In his brief, Barrow describes counsel's mistakes as "incredible" (p.20), "startling" (p.32) and "ludicrous" (p.32), stating that counsel showed "remarkable consistency in his incompetence" (p.21).

2003) (lawyer's erroneous advice about the length of defendant's potential sentence and the consequences of a plea bargain failed *Strickland*'s objective reasonableness prong); *Dixon*, 266 F.3d 693, 701-03 (counsel's ignorance of the relevant law can be objectively deficient under *Strickland*). There is no question that, in failing to adduce any evidence in defense in a capital case, based at least in part on an erroneous understanding of state law, the performance of Barrow's lawyer fell well outside the "range of competence demanded of attorneys in criminal cases." *Strickland*, 466 U.S. at 687 (quotation omitted). On this basis we consider the Illinois Supreme Court's application of the first prong of the *Strickland* test unreasonable.

Nonetheless, the Illinois Court's final ruling on *Strickland*'s second "prejudice" prong is another matter, especially given the highly deferential standard of review mandated by § 2254 of AEDPA. The Illinois Supreme Court concluded that, in light of the "overwhelming" evidence against Barrow, the absence of exculpatory evidence at trial did not alter the final outcome of the case. 133 Ill.2d at 250; 195 Ill.2d at 525. Of course, it is always difficult (if not impossible) to prove a counter-factual proposition such as this, but the touchstone of federal habeas review under AEDPA is reasonableness, not substantive rectitude. 28 U.S.C. § 2254(d) (2003). *See also Williams v. Taylor*, 529 U.S. 362, 407-12 (2000). Regardless of our view of the merits of the Illinois Court's determination, we may not disturb it if it represents a reasonable application of *Strickland*. In light of the evidence against Barrow—including a recorded confession in which Barrow describes the details of the crime to Smokey Wrona—the Illinois Court's ruling certainly does not appear patently unreasonable. The same may be said of Barrow's other claims regarding the adequacy of counsel's cross-examination of Smokey Wrona, his failure to object to certain state evidence and his misstatements during opening and closing arguments. While such failures may be objectively

deficient, one cannot say that the Illinois Supreme Court applied *Strickland* unreasonably in concluding that they were non-prejudicial. Section 2254 of AEDPA requires nothing more.

Barrow next contends, as a separate ground for his ineffective assistance of counsel claim, that his attorney promised the jury he would present exculpatory evidence—including testimony from Barrow himself—and then failed to do so. This claim may be seen as a reprise of Barrow's more general claim regarding counsel's failure to introduce exculpatory evidence,[6] though the district court recognized it as a separate claim and apparently evaluated it *de novo* (though it did not explicitly so state). 2003 WL 21920258, at *24 (citing *Patrasso v. Nelson*, 121 F.3d 297, 302 (7th Cir. 1997)). We tend to agree with the district court that this claim is conceptually independent of the others. In *Hampton v. Leibach*, 347 F.3d 219 (7th Cir. 2003), we addressed this very issue, and there we placed great importance on counsel's unfulfilled promises to the jury as distinct from the more general failure to present evidence. *Hampton* held that where a lawyer has promised the jury that a criminal defendant will testify in his own defense, and then unreasonably breaks this promise by not calling the defendant to the stand, such an error is both objectively unreasonable and prejudicial to the defendant. *Id.* at 257-60.

However, in *Hampton*, this Court placed special importance on the fact that trial counsel had specifically promised the jury that the defendant would testify *himself. Id.* Here, while it is undisputed that Barrow's attorney promised to present exculpatory evidence, and while, by presenting his opening statement in the first person plural (using the pro-

---

[6] In its post-conviction proceedings, the Illinois Supreme Court took this view and dismissed the issue as *res judicata*. 195 Ill.2d at 520.

noun "we"), he arguably insinuated that Barrow would participate personally in the defense, counsel made no explicit promise that Barrow would testify himself.[7] Even more importantly, the case at bar also differs from *Hampton* on the crucial prejudice issue. In *Hampton*, this Court held that the defendant was prejudiced by counsel's failure to call him to the stand, in large part because the sole evidence against him was other eyewitness testimony. *Id.* Under such circumstances, we concluded that defendant's opportunity to contradict and cast doubt on such testimony was critical to his defense. *Id.* In this case, by contrast, the primary evidence against Barrow was his own oral confession, recorded during a conversation with state witness Wrona, in which Barrow unequivocally confessed to the crime and described in his own words how he committed it. Under these circumstances, Barrow's personal testimony seems far less crucial to his chances of success at trial.

This is especially so because of the content of Barrow's proposed testimony. Barrow claims he would have testified that his taped conversation with Wrona concerned another crime in another state, that he was spotted in the vicinity of Cedar Point, Illinois on the night of the murder because he was delivering a suitcase for Wrona in that area, and that he was carrying $500 in cash (the precise amount that the victim habitually carried) because Wrona had paid him

---

[7] Barrow's attorney speaks in the first person plural throughout his opening statement, using language like "we will show," "we had a reason," etc. (*See* R. at 1863-72.) However, the closest he comes to promising personal testimony from Barrow is the following statement: "We have a place that we were located at on the evening of the murder at or about the proposed time of the murder *that we will tell you about.* We have a line of progression of events after that which will clearly show to you how Ron Barrow got to where he was at . . . ." (R. at 1865 (emphasis added).)

a fee for delivering the suitcase.[8] However, Barrow does not offer any detail (nor was he able to offer any at oral argument) as to what this alleged "other crime" was, when it occurred, or why it was recounted (in the recorded conversation with Wrona) in terms so uncannily similar to the crime for which Barrow was convicted. In short, it seems most unlikely that Barrow's testimony, as described at this late stage, could have altered the ultimate verdict.[9]

---

[8] Barrow's brief presents his proposed testimony as follows:

Ronald Barrow would have testified . . . that he was innocent of the crimes charged, that he knew nothing about the killing with which he was charged and that he never spoke to Wrona about the murder of the victim. His April 6, 1984 taped conversation with Wrona concerned another crime in another state which Wrona had arranged. Mr. Barrow would also have testified that he was in Illinois in February, 1984 to deliver a suitcase for Wrona, that he received a $500 money order from Wrona as a fee for arranging the delivery of the suitcase. On February 18, 1984, he was with his brother Bruce at the Lamp Liter Bar in Ottaoa, IL until 1:30 A.M. when they left on Route 6 to return to the Holiday Inn Motel, that his brother missed the exit, took the next exit at Route 51 and made a U-turn at the first available road, after which an Illinois State Trooper began following their car, that neither he nor his brother has ever been in Cedar Point, IL, that he was not wearing "hush puppy" shoes while he was in Illinois, that he did not have a gun in his possession that night, and that, at the time, he was attempting to be included in Wrona's "mob partners."

(Appellant's Br. at 28.)

[9] This is so even under the more lenient formulations of the "prejudice" standard cited by Barrow. *See Strickland*, 466 U.S. at 694 (defendant need only show "reasonable probability" of a different result); *Hampton*, 347 F.3d at 255-56 (defendant must show a

(continued...)

Thus, while we take pains to reaffirm the importance of the principle articulated in *Hampton*—that unfulfilled promises to present personal testimony from a criminal defendant are highly suspect under *Strickland*—*Hampton* is distinguishable from the case at bar. We also agree with the district court[10] that, regardless of the standard of review employed,[11] given the abundance of evidence against him, Barrow cannot show that he suffered prejudice from his attorney's unfulfilled promises to present evidence.

Finally, Barrow also contends that his decision not to testify, based on his lawyer's "ridiculous" advice, was not intelligent or informed and thus constituted a violation of his constitutional right to present testimony in his own defense. Barrow, of course, is correct that the right to testify in one's own defense is a fundamental procedural right. He

---

[9] (...continued)
"better than negligible" likelihood of acquittal).

[10] For the district court's ruling on this issue *see* 2003 WL 21920258, at *21 (citing *Gibbs v. VanNatta*, 329 F.3d 582, 584 (7th Cir. 2003) ("defendant must show effective assistance would have given him a reasonable shot at acquittal.")).

[11] The Government urges this Court to reject the district court's *de novo* approach and review this claim under § 2254's far more deferential standard. (Gov. Br. at 17-18 (citing *Gomez v. Acevedo*, 106 F.3d 192, 196-201 (7th Cir. 1997) *vacated on other grounds,* 522 U.S. 801 (1997).) The State does not spend much time on this point, however, and states that *de novo* review is appropriate if this Court "disagrees with the rationale of *Gomez.*" *Id. Gomez* does apply the deferential AEDPA standard to an issue deemed *res judicata* under state law, and the Supreme Court's subsequent reversal of the *Gomez* decision rested not on this ruling but on the Seventh Circuit's improper retroactive application of the AEDPA. This would seem to argue for application of AEDPA's deferential "reasonableness" review. Yet in any event, the precise standard of review does not affect the ultimate disposition of Barrow's claim.

is also correct that a defendant must acquiesce fully and intelligently in counsel's attempts to waive that right— only the defendant himself, not his lawyer, can waive the right to testify. *See Ward v. Sternes*, 334 F.3d 696, 705-07 (7th Cir. 2003). Barrow cites our decision in *Moore v. Bryant*, 348 F.3d 238 (7th Cir. 2003), for the proposition that a fundamental trial right is not properly waived when the purported waiver is based on erroneous legal advice.

Barrow may find some support in *Moore*, but only indirectly. *Moore* held that a defendant's decision to plead guilty was not a valid waiver of his right to stand trial when that decision was based upon his lawyer's erroneous advice regarding the sentencing consequences of plea bargaining versus going to trial. But crucially, the court in *Moore* also required a showing of prejudice, i.e., that the erroneous legal advice actually changed the outcome of the case. *Id.* at 241-43. In *Moore*, since the court was convinced that the defendant would have elected to stand trial but for counsel's erroneous advice, defendant's plea was invalidated. *Id.* Here, it is clear that Barrow elected not to testify based on his lawyer's admittedly mistaken legal advice. However, as discussed above, it also seems clear that Barrow's claims regarding counsel's failure to call him as a witness do not entitle him to relief, even under *de novo* review.[12]

---

[12] It is an interesting question whether defendant's forfeiture of his constitutional right to testify, standing alone, is sufficiently "prejudicial" to warrant reversal of a conviction, or whether the decision not to testify—even when based on erroneous legal advice—is not prejudicial unless it actually affects the outcome of the trial. Seventh Circuit precedent seems to support the latter view that defendants who allege they waived their right to testify still must show that this waiver was prejudicial, i.e., that the failure to testify affected the outcome of the trial. *See, e.g., Rodriguez v. United States*, 286 F.3d 972, 983-84 (7th Cir. 2002).

## V.  CONCLUSION

We cannot say that the Illinois Supreme Court's ruling involved an unreasonable application of Supreme Court precedent under *Strickland v. Washington*. We therefore AFFIRM the order of the district court denying Barrow's petition for a writ of habeas corpus.


A true Copy:

       Teste:

                              _____

                              *Clerk of the United States Court of*
                                 *Appeals for the Seventh Circuit*