In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1940

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ELIZABETH HUERTA,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 99 CR 103--James T. Moody, Judge.

Argued November 30, 2000--Decided February 2, 2001

Before RIPPLE, MANION and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.  Elizabeth Huerta was
charged with distributing cocaine and possessing
with intent to distribute, in violation of 21
U.S.C. sec. 841(a)(1). Following a trial, Ms.
Huerta was found guilty, and the district court
sentenced her to 235 months' imprisonment. For
the reasons set forth in the following opinion,
we affirm Ms. Huerta's conviction and sentence.

I
BACKGROUND
A.  Arrest and Interrogation

   Officers of the Michigan City, Indiana, Police
Department received information on December 18,
1998, that an employee of PSW Industries, Inc.
("PSW") named Elizabeth Huerta was trafficking in
narcotics. Police identified Ms. Huerta's car in
the PSW parking lot and followed it to a local
Subway restaurant, where they observed an alleged
drug transaction. Ms. Huerta and the putative
purchaser were stopped, and Ms. Huerta was
arrested.

   The police recovered two baggies containing 6.7
grams of cocaine from the purchaser. Ms. Huerta,
for her part, had in her possession a pager,
$4,957 in cash, three notebooks, a scrap of paper
with writing on it, and a check for $353.
Detectives also conducted a search of Ms.

Huerta's locker at PSW/1 and found sixteen plastic bags inside two pairs of shoes containing a total of 163.27 grams of cocaine.

1.

Back at the station, Detectives Bush and Swistek began interviewing Ms. Huerta at approximately 5 p.m. The details of the interviews are disputed. The Government contends that the detectives first advised Ms. Huerta of her constitutional rights. Then, they presented her with a waiver of rights form, which included questions as to whether she had read and understood her rights, desired an attorney, had been subjected to threats or promises, and was willing to talk to police. There were spaces for Ms. Huerta to initial each inquiry, indicating that she understood it, and spaces to write answers to questions regarding waiver of rights.

Detective Bush, as was his practice, read the form aloud and instructed Ms. Huerta to stop him with any questions. She then initialed the document, answered the questions, and signed the form. She initially wrote yes in response to the question "Has any force, threats or promises of any kind or nature been used by anyone to influence you to waive these rights?". Trial Tr., Vol. 4 at 85. After the detectives asked her if she meant to indicate yes, she said that she had made a mistake, changed her answer to no, and initialed the change. At no time did Ms. Huerta inform the detectives that she wanted an attorney or that she had called one.

During this first interview, Ms. Huerta denied selling cocaine. She did not respond to a particular question during the discussion; when asked why not, she indicated that she was thinking about whether she needed an attorney. The detectives then ended the interview.

After the interrogation had concluded, the detectives learned that an attorney had arrived to see Ms. Huerta. The lawyer had left, however, before the interrogation was completed. The detectives did not tell Ms. Huerta of the visit because they did not intend to interrogate her further.

Later that evening, at approximately 10:30 p.m., Detectives Bush and Westphal decided to take as evidence the shoes Ms. Huerta was wearing. When Ms. Huerta questioned the detectives' actions, they told her they wanted the shoes to compare them to the shoes found in her locker. The detectives began to walk away, and Ms. Huerta called to them to come back and informed them that she wanted to talk.

After discussing how to proceed, Detectives Bush and Swistek began a second interview at approximately 10:50 p.m./2  Ms. Huerta was apprised of her constitutional rights and was again presented with a waiver of rights form, which Detective Swistek read aloud. She initialed where required, answered the waiver questions, and signed the form. Ms. Huerta then admitted to the sale of cocaine that had occurred earlier that day and to the possession of the cocaine in her locker.

In addition to these oral statements, the detectives took a taped statement. The tape began with the detectives advising Ms. Huerta of her rights and includes questions and answers reflecting the fact that Ms. Huerta initiated the second interview and that she was not coerced. In the taped statement, Ms. Huerta again admitted to distributing and possessing cocaine. She also identified her supplier as an individual named Jesse. She indicated that the notebooks contained records of money owed to Jesse and not to her.

After taking police officers to the place where she obtained drugs from her supplier, Ms. Huerta was released on bond.

2.

Ms. Huerta, in contrast, sets forth a dramatically different set of events. She related that she called her brother after she was arrested and requested that her attorney come to the station. During the interview with police, Ms. Huerta told the officers that she did not want to talk without her attorney and that her attorney was on his way. The detectives told her that she did not need an attorney because they, the detectives, were her attorneys. The detectives also informed Ms. Huerta that she did not need an attorney until she went to court. Ms. Huerta wrote her request for an attorney on the waiver form; the police, unhappy that she requested a lawyer, tore up the form.

Ms. Huerta was then presented with a second waiver form. When she wrote yes in response to the intimidation question, it was not a mistake but rather an expression of how she felt. The detectives pressured her to change her answer to no and to initial the change. In the interrogation that followed, Ms. Huerta denied her involvement with the drugs.

Sometime during the interview in which Ms. Huerta denied involvement with the drug sale, her attorney arrived at the police station. No one told Ms. Huerta, however, that he was there.

Apparently, the lawyer grew tired of waiting and left. The detectives also told Ms. Huerta that, if she told them what they wanted to hear, she would be permitted to go home for Christmas and be with her children; otherwise, she would not see them again. Detective Bush told Ms. Huerta that he would not use the drugs found in her locker if she talked to him. Ms. Huerta signed a third waiver of rights form around 11 p.m. and gave a statement admitting her involvement in the distribution of drugs through PSW. She now maintains that this statement was untruthful; she made up a story only to give the detectives "what they wanted to hear" so that she could go home. Suppression Hearing Tr. at 31. She also contends that the police turned the tape on and off and rewound as necessary to record the statement exactly the way they wanted it.

Ms. Huerta submits, too, that she had taken some medicine shortly before noon, affecting her ability to understand the events at the police station. She had eaten nothing before she was arrested and had been given nothing to eat while in custody.

B.  Suppression Hearing

In a two-count indictment filed on June 17, 1999, Ms. Huerta was charged with distributing cocaine and possessing cocaine with intent to distribute. She was arrested on July 1, 1999, and, following a detention hearing, was detained pending trial. On July 6, 1999, Ms. Huerta pled not guilty, and the matter was set for trial.

Prior to trial, Ms. Huerta filed a motion to suppress (1) the statements she had made to the police and (2) the evidence that the police had found in her locker at work. The district court denied both motions after an evidentiary hearing on October 12, 1999. Both Ms. Huerta and the detectives who questioned her testified at the suppression hearing. Ms. Huerta set forth her story of coercion and police misconduct, as detailed in part A. The officers denied tearing up the first waiver form, coercing Ms. Huerta to waive her rights and make a statement, telling her that they were her attorneys, telling her she could go home if she cooperated, and manipulating the tape recorder to fabricate a statement.

The district court denied Ms. Huerta's motion to suppress her oral and tape-recorded statements to the police, relying primarily on Detective Bush's and Detective Swistek's testimony. Specifically, the court found credible their testimony that, when Ms. Huerta requested a lawyer, they ceased their questioning. The court found, too, that Ms. Huerta initiated the next contact with the

detectives when she said she wanted to speak further with them. The court concluded that both the oral and tape-recorded statements were voluntarily made and that the waivers preceding them were similarly voluntary and intelligent.

C.  Trial and Sentencing Hearing

At trial, which began on October 26, 1999, the Government submitted into evidence the tape-recorded statement that Ms. Huerta had attempted to suppress, notebooks taken from Ms. Huerta when she was arrested, and testimony from a special agent with the Drug Enforcement Administration ("DEA") indicating that those notebooks contained records of drug transactions (known as "drug notes"). The three detectives involved in the interrogation of Ms. Huerta testified again, as did Ms. Huerta herself. Each witness relayed the same story as that presented at the suppression hearing, except that Ms. Huerta put forth in more detail an alternate explanation of the events precipitating her arrest./3

The jury returned a verdict of guilty on both counts on October 28, 1999. In the presentence investigation report, the probation officer recommended that Ms. Huerta be held responsible for 5.26 kilograms of cocaine, including the 6.7 grams that Ms. Huerta allegedly had distributed the day she was arrested, 163.27 grams possessed for distribution on that day, and 5.1 kilograms for sales reflected in the drug notes. The report also suggested that Ms. Huerta receive a two-level increase for obstruction of justice based on perjurious testimony given at the detention and suppression hearings and at trial. Ms. Huerta objected both to the use of the drug notes in the drug amount calculation and the increase for obstruction of justice.

A sentencing hearing was held on March 29, 2000. At the hearing, a government expert calculated the amount of drug sales reflected in the drug notes. The court also heard Ms. Huerta's recorded statements about the notebooks. She admitted that the books were drug records, although she claimed that they reflected her supplier's transactions. At trial, however, she conceded that at least one notebook was hers but claimed that the notes were records of welding done at work and of money she loaned to others.

The district court concluded that Ms. Huerta was responsible "at a bare minimum" for 5.26 kilograms of cocaine, adding together the 6.7 grams distributed on the day of arrest, 163.27 grams possessed for distribution on that day, and 5.1 kilograms for sales set forth in the drug notes. Sentencing Hearing Tr. at 47. The court also found that Ms. Huerta had obstructed justice

when she committed perjury at her detention and suppression hearings and at trial. The court, therefore, increased Ms. Huerta's offense level by two levels.

Based on these findings, the district court established an offense level of 34 and a criminal history category of III, with a guideline range of 188 to 235 months. The court sentenced Ms. Huerta to a term of 235 months' imprisonment on both counts, to be served concurrently. Ms. Huerta now appeals.

II
ANALYSIS

Ms. Huerta makes five principal claims on appeal: (1) that her confession was involuntary; (2) that the police violated her rights to remain silent and have counsel present during interrogation; (3) that the police committed a due process violation by not informing her of her attorney's visit; (4) that the evidence offered at the sentencing hearing to calculate other relevant conduct was unreliable; and (5) that the quantity of drugs should have been considered an element of the crime and submitted to the jury. We shall address each in turn.

A.  Voluntariness of Confession

Ms. Huerta claims that the detectives used threats, promises of leniency, and other coercive tactics to induce her to confess involuntarily. A district court may admit a confession into evidence only if the accused made it voluntarily. See United States v. Dillon, 150 F.3d 754, 757 (7th Cir. 1998). A confession is voluntary if, in the totality of the circumstances, it is the "product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." Id. Thus, coercive police activity is a "necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986).

Whether a confession is voluntary is a matter of law that we review de novo, but the "determination of the historical facts of the case are the proper domain of the trial court and . . . our review of its finding in that regard will be for clear error." United States v. Jordan, 223 F.3d 676, 683 (7th Cir. 2000) (citation and quotation marks omitted). A finding of fact is clearly erroneous when a review of the entire record leaves us with a "definite and firm

conviction that a mistake has been made." Dillon, 150 F.3d at 757. Under the clearly erroneous standard, "if two permissible views exist, the fact-finder's choice between them cannot be clearly erroneous." United States v. Hardamon, 188 F.3d 843, 848 (7th Cir. 1999) (citation and quotation marks omitted). The clearly erroneous standard is especially deferential of a district judge who has conducted a suppression hearing, heard the conflicting testimony, observed the witnesses, and then reached a determination about whom to believe. See United States v. Springs, 17 F.3d 192, 194 (7th Cir. 1994).

More specifically, we analyze coercion from the perspective of a reasonable person in the position of the suspect. See United States v. Brooks, 125 F.3d 484, 492 (7th Cir. 1997). Factors relevant to that determination are the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep. See id. Narcotics, alcohol, and fatigue also may be considerations in a particular case. See id.

Because Ms. Huerta and the Government both set forth a significantly different description of events, this challenge "boils down to a question of credibility." Dillon, 150 F.3d at 757. Ms. Huerta asserts that her confession was involuntary, based on the following events: her requests for an attorney were rejected; police tore up the waiver form where she asserted her right to counsel; police threatened her and forced her to change her answer on the waiver form indicating that they did not coerce her; police turned on and off the tape recorder to manipulate her statement; her medication prevented her from understanding the proceedings; she had not eaten all day and was tired; police promised her that if she confessed, she could go home for Christmas and be with her children; police promised that they would not use the drugs recovered from her locker if she confessed; police told her she did not need an attorney until she went to court; and police told her that they were her attorneys.

The district court--twice--heard testimony of both Ms. Huerta and the three detectives involved in the interrogations and chose to believe the police version of events. In the suppression hearing, for example, the court deemed "credible" testimony that the police ceased questioning Ms. Huerta upon her request for an attorney. Suppression Hearing Tr. at 152. The court also found that Ms. Huerta reinitiated questioning

later in the evening. She was again advised of her Miranda rights, the court found, and she signed a written waiver before confessing orally. The court explicitly concluded that both the waiver and oral statement were voluntarily made. The court found, too, that Ms. Huerta was then advised of her rights for the third time, waived them knowingly and intelligently, and voluntarily made the tape-recorded statement.

As we noted earlier, we defer to a district court's credibility determination unless the district court has chosen to credit exceedingly improbable testimony. See Dillon, 150 F.3d at 758. Ms. Huerta has made no showing that the district court's determination was exceedingly improbable; she merely presents a contradictory statement of facts. That is not enough. In United States v. Smith, 218 F.3d 777 (7th Cir. 2000), for example, we explained that the defendant's motion to suppress "presents 'a factual dispute,' a veritable 'she said' versus 'they said.' The District Court ruled against [the defendant] after hearing evidence, saying [the defendant's] testimony was 'totally unbelievable.' We must give deference to the District Court's findings of fact and credibility determinations." Id. at 780 (citations omitted). We point out, too, that the district court did more than disbelieve Ms. Huerta's testimony; it found that she committed perjury at the detention and suppression hearings and at trial, thereby warranting a sentencing enhancement for obstruction of justice.

We thus conclude that the detectives' testimony is not exceedingly improbable. No evidence, other than that provided by Ms. Huerta, indicates that the police threatened, deliberately confused, or otherwise coerced her. Moreover, no credible evidence exists that Ms. Huerta was too tired, medicated, or hungry to understand the proceedings. She remained in custody for approximately eleven hours, a long time but not oppressively so, and was not continuously interrogated during that period. There is no indication that Ms. Huerta informed the detectives of the medication she had ingested on an empty stomach. Further, Detective Bush testified at trial that department practice mandates that the desk sergeant ensures that all suspects are fed./4

In addition, Ms. Huerta is somewhat experienced in the criminal justice system, although she claims that she never has been subjected to interrogation and the intricacies of waiver. She has been convicted twice of other drug-related felonies; when she was arrested on the charges at issue in this appeal, she was still on supervised release from her last conviction.

Accordingly, we do not believe that the district court erred in finding Ms. Huerta's confession voluntary.

B. Waiver of Miranda Rights

Ms. Huerta also asserts that the police violated her rights to remain silent and have counsel present during interrogation. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). She maintains that she invoked her right to counsel but that the detectives continued to interrogate her. She requested counsel at the start of the interrogation, as well as indicated this preference on the waiver of rights form that was destroyed. Ms. Huerta also argues that she did not voluntarily waive her right to counsel; at the time she signed the last waiver, she had been in custody for approximately eleven hours, was tired, was on medication, and had not eaten all day.

We review de novo the determination of the trial court that a waiver of Miranda rights was voluntary. See Smith, 218 F.3d at 780; United States v. Mills, 122 F.3d 346, 350 (7th Cir. 1997). Again, however, the district court's findings of historical fact are not reversed unless clearly erroneous. See United States v. Westbrook, 125 F.3d 996, 1001 (7th Cir. 1997). In Miranda, the Supreme Court ruled that a waiver is valid if made voluntarily, knowingly, and intelligently. See 384 U.S. at 444. The Court elaborated on the standard in Edwards v. Arizona, 451 U.S. 477 (1981), in which it held that the waiver must be "of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case." Id. at 482 (citation and quotation marks omitted). Factors considered in the analysis include the defendant's background, experience, and conduct. See North Carolina v. Butler, 441 U.S. 369, 374-75 (1979).

Ms. Huerta's Miranda arguments, like her voluntariness claim, do not demonstrate that the district court erred. Indeed, they reiterate the identical factual assertions that the district court rejected with respect to her voluntariness claim. As the district court found, the detectives ended the interview once Ms. Huerta indicated that she desired to exercise her right to counsel. The detectives did not speak to Ms. Huerta again until they asked her for her shoes, an exchange that does not constitute interrogation under Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980), and its progeny. We cannot disagree with the district court's conclusion that Ms. Huerta herself initiated the second interview by asking first why the officers

wanted the shoes and then informing them that she wanted to talk further. Because Ms. Huerta initiated the second conversation, the police could interrogate her despite the earlier invocation of counsel. See Edwards, 451 U.S. at 484-85 (setting forth the prophylactic rule that once a suspect asserts his right to counsel, further interrogation should not take place unless the "accused himself initiates further communication, exchanges, or conversations with the police").

Even if the suspect reinitiates conversation, however, the burden "remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." Oregon v. Bradshaw, 462 U.S. 1039, 1044 (1983). Before the second interrogation began, Ms. Huerta was advised of her rights and then signed the form indicating waiver, thus fulfilling the waiver requirement. Ms. Huerta did testify that she was heavily medicated, tired, and had not eaten all day, but the district court implicitly credited the detectives' testimony that they regularly fed all suspects. There was no evidence that Ms. Huerta's behavior indicated that she was under the influence of medication. Further, just because Ms. Huerta was tired does not establish that her will was "overborne." Brooks, 125 F.3d at 492. Under the totality of the circumstances, therefore, we do not see any evidence that Ms. Huerta's lack of food or sleep or her medicated state interfered with her capacity to make a knowing and intelligent waiver.

C.  Visit from Attorney

Ms. Huerta also maintains that the police never told her that her lawyer had arrived at the station to see her. The Government explains that the lawyer, tired of waiting, left the station and that the detectives did not know the lawyer had arrived until after the first interview had been completed and the lawyer already had departed. Furthermore, the police did not mislead the attorney or make any statements of any kind to the attorney. Although we are troubled by the police's behavior, a close examination of the record does not reveal a basis that warrants, under settled precedent, a reversal on this ground.

In Moran v. Burbine, 475 U.S. 412 (1986), the Supreme Court held that the failure to inform a defendant of an attorney's presence does not invalidate an otherwise valid waiver of the right to counsel. See id. at 422. An attorney, who had been retained by the accused's sister, contacted the police station where the accused was being

held. Although the attorney received assurances that the accused would not be questioned until the next day, the interrogation that yielded the inculpatory statements began later that evening. Moreover, the police did not tell the accused about the attorney's call. The Supreme Court found no violations of the Fifth or Sixth Amendments in the police's conduct, explaining that:

Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right. . . . No doubt the additional information would have been useful to respondent; perhaps even it might have affected his decision to confess. But we have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights. . . . Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

Id. at 422-23.

Ms. Huerta relies, specifically, on the due process component of Moran. The Supreme Court recognized in Moran the constitutional protection of "canons fundamental to the traditions and conscience of our people." Id. at 432 (citation and quotation marks omitted). Although the Court determined that the police misconduct in Moran did not rise to the level of a due process violation, it noted that a violation may be found when such behavior "so shocks the sensibilities of civilized society." Id. at 433-34.

Based on the Supreme Court's holding in Moran, we do not believe that the Michigan City Police Department has conducted itself in a manner violative of due process. In Moran, the police actually misled the attorney by telling him that his client would not be interrogated that day, yet this act did not constitute a due process violation. See also Matney v. Armontrout, 956 F.2d 824, 825-26 (8th Cir. 1992) (holding that police failure to inform the accused of his attorney's attempts to contact him and misstatements to the attorney as to whether the accused was at the police station did not violate the accused's due process rights).

In Ms. Huerta's case, there is no evidence that

the police misled her attorney. Rather, the record shows only a lack of knowledge. The investigating detectives did not know that Ms. Huerta's attorney had arrived until after the attorney had departed and the interrogation had been concluded. The detectives never relayed this information to Ms. Huerta, but, as Detective Bush explained, he did not think he would be talking with her again. These circumstances, taken alone or together, are not as egregious as the facts in Moran and Armontrout and, therefore, do not shock the "sensibilities of civilized society."/5

D.  Drug Quantity Calculation

   At the sentencing hearing, the district court found that Ms. Huerta's other relevant conduct included the 5.1 kilograms of cocaine reflected in her drug notes. This conclusion was based on testimony given by two government witnesses, testimony Ms. Huerta now denounces as unreliable.

   In determining a drug offender's base offense level, a district court considers quantities of drugs that were not specified in the count of conviction but that were part of the "same course of conduct or common scheme or plan" as the offense of conviction. United States Sentencing Guideline sec. 1B1.3(a)(2); see also United States v. Johnson, 227 F.3d 807, 813 (7th Cir. 2000). A district court's determination of the quantity of drugs included as relevant conduct is a finding of fact that we review for clear error. See Hardamon, 188 F.3d at 848. Thus, we shall not reverse the district court's decision unless we are left with a "definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948); United States v. Brown, 136 F.3d 1176, 1184 (7th Cir. 1998).

   We have noted that a district court may consider a "wide range of information" when calculating drug quantities, so long as the court has a "sufficient indicia of reliability to support its probable accuracy." United States v. Robinson, 164 F.3d 1068, 1070 (7th Cir. 1999) (citation and quotation marks omitted). When assessing the reliability of the evidence, we leave "credibility determinations to the sound discretion of the district court." United States v. Johnson, 200 F.3d 529, 537 (7th Cir. 2000); see also Johnson, 227 F.3d at 813 (noting that a sentencing court's credibility determinations are accorded "exceptional deference"). Further, courts have, in the past, utilized drug notes to calculate drug quantities. See United States v. Cagle, 922 F.2d 404, 407 (7th Cir. 1991); see also United States Sentencing Guideline sec. 2D1.1, application note 12 (explaining that

courts determining drug quantities may consider "financial or other records").

Both expert witnesses proffered by the Government--one at trial and one at the sentencing hearing--testified that some of the notebooks were drug notes. Both individuals have a good deal of experience working on drug-related matters. Witness Balbo is a special agent with the DEA and has been involved in "many hundreds" of drug investigations. Trial Tr., Vol. 4 at 133. Witness Carlson works with narcotics trafficking records, is responsible for keeping the DEA's log on the street price of cocaine, and teaches seminars on drug notes.

The witnesses testified that the references in the drug notes to "w" were to cocaine, confirmed for them by the dollar amounts listed in the adjacent column on the page, figures that corresponded to the current street price for cocaine. Notably, the dates listed in the books ended the day of Ms. Huerta's arrest. Although a handwriting comparison was not performed, the notebooks were in Ms. Huerta's possession when she was arrested, and, as Balbo testified, drug dealers typically keep their drug notes readily available.

In addition to the expert testimony, the district court heard Ms. Huerta's taped statements made the day of her arrest. On the tape, Ms. Huerta admitted that the notebooks were drug records, although she claimed that they reflected her supplier's drug transactions. She conceded at trial that at least one of the notebooks belonged to her; she maintained, however, that the "w"'s were references to welding projects at work.

Ms. Huerta argues that the testimony of both witnesses was unreliable. The handwriting in the notebooks was never identified as hers. The letter "w" was listed only six or seven times in twenty-eight pages in the notebooks. In sum, Ms. Huerta submits, the expert testimony failed to establish that the notations in the books were directly related to her; that all the substances referred to were cocaine; and that the notations and distributions were of the same, or part of the same, course of conduct, scheme, or plan as the two charges of which Ms. Huerta was convicted.

Again, where there are two permissible views of the evidence, we review the factfinder's choice between them only for clear error. See Hardamon, 188 F.3d at 848. It was within the district court's discretion to credit the testimony of the expert witnesses, and we believe that evidence is

sufficiently reliable to withstand our limited review. More precisely, both witnesses explained that the notebooks were drug notes. Both testified that the "w" notations referred to cocaine. The dates listed in the book stopped abruptly on the day of Ms. Huerta's arrest, and Ms. Huerta admitted at trial that at least one of the notebooks was hers. No facts directly contradicted the witnesses' testimony. We conclude, therefore, that the evidence underlying the witnesses' testimony had a sufficient indicia of reliability. The district court's drug quantity calculation must be upheld.

E.  Apprendi Issue

  Ms. Huerta also submits that the district court committed plain error by not submitting the question of drug quantity to the jury for its determination. We cannot agree. In Apprendi v. New Jersey, 120 S. Ct. 2348, 2362-63 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Although Apprendi does apply to 21 U.S.C. sec. 841, the statute under which Ms. Huerta was convicted, there was no error in this case because the sentence imposed--235 months--was within the statutory maximum penalty for possession with intent to distribute cocaine regardless of the quantity of the drug involved. See Talbott v. Indiana, 226 F.3d 866, 869 (7th Cir. 2000) ("When a drug dealer is sentenced to less than 20 years' imprisonment--the limit under 21 U.S.C. sec. 841(b)(1)(C) for even small-scale dealing in Schedule I and II controlled substances . . . Apprendi is irrelevant."). Our precedent interpreting Apprendi has made clear that its holding is inapplicable in situations in which the sentence established is not "more severe than the statutory maximum for the offense imposed by the jury's verdict." Apprendi, 120 S. Ct. at 2361 n.13; see also Hernandez v. United States, 226 F.3d 839, 841-42 (7th Cir. 2000).

Conclusion

  Accordingly, Ms. Huerta's conviction and sentence are affirmed.

AFFIRMED

/1 The human resources manager at PSW informed the police that PSW policy permitted the company to search employee lockers. The resulting search was the subject of a motion to suppress, which the district court denied. The issue is not before us

in this appeal.

/2 Detective Swistek was present for only part of this second interrogation. Detective Westphal replaced him when he left the room to attend to other business.

/3 Specifically, Ms. Huerta claimed that she went to Subway to purchase a sandwich for lunch and met a co-worker, Elmo Long, there. Long had owed her money and had given her a check for $353 but had forgotten to endorse it. Long entered Ms. Huerta's vehicle, signed the check that Ms. Huerta had taken from her pocket, and handed it back to her. Ms. Huerta also gave Long $150 that she owed him, which Long put in his pocket.

Ms. Huerta also explained at trial that the day before she was arrested, she dropped off a car at a used car lot. The morning of her arrest, she sold the car to a friend between 5 a.m. and 6 a.m. and received $4,957 in cash.

/4 Ms. Huerta claims that she was not offered food until just before she was released, some eleven hours after first being taken into custody.

/5 Ms. Huerta attempts to distinguish her case from that in Moran by noting that she, unlike Mr. Moran, specifically invoked her right to counsel. The district court, however, made no specific findings regarding the attorney's visit or whether the police knew that Ms. Huerta was expecting an attorney, and the record is underdeveloped in this regard. There is no testimony from Ms. Huerta's lawyer as to what occurred at the station, for example, nor is there testimony from the desk sergeant who interacted with the lawyer. All we have is Ms. Huerta's explanation of what happened and testimony of the detectives that they were alerted to the lawyer's presence after the lawyer had already left and the interrogation had concluded. Thus, without specific evidence to the contrary, we must defer to the district court's general acceptance of the police's explanation of events.