# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-1741

ALEJANDRO RUVALCABA,

*Petitioner-Appellant,*

*v.*

NEDRA CHANDLER, Warden,

*Respondent-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois,
Eastern Division.
No. 01 C 200—**Joan Humphrey Lefkow**, *Judge.*

_____

ARGUED FEBRUARY 8, 2005—DECIDED JULY 20, 2005

_____

Before RIPPLE, EVANS and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* An Illinois jury convicted Alejandro Ruvalcaba of the first degree murder and attempted murder of rival gang members. He unsuccessfully appealed to the Appellate Court of Illinois. The Supreme Court of Illinois later denied review. He then timely filed a petition for federal habeas relief. *See* 28 U.S.C. § 2254. In that petition, he asserted, among other matters, that his confession was involuntary and that he had been unduly prejudiced by

prosecutorial misconduct. The district court denied his petition on the ground that the state court's decision was neither contrary to nor an unreasonable application of federal law. The district court granted a certificate of appealability with respect to the involuntary confession issue, and a certificate was issued on the prosecutorial misconduct claim after the case was docketed in this court. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

When he was sixteen years old, Mr. Ruvalcaba, together with two other members of the Latin Kings gang, Juan Meneses and Juan Alvarez, encountered rival La Raza gang members, Carlos Flores, Hiram Martinez and Luis Sanchez. This confrontation took place in a Chicago alley on November 7, 1994. Earlier in the day, someone had broken a window on Meneses' car, an act of vandalism that he attributed to La Raza. Meneses and Mr. Ruvalcaba were both armed. The two groups exchanged gang signs. According to the La Raza survivors, Meneses and Mr. Ruvalcaba drew their firearms; Flores, Martinez and Sanchez attempted to run away. According to Mr. Ruvalcaba, Meneses and Flores began shooting at each other, and he joined in. Regardless of who initiated the altercation, Meneses and Mr. Ruvalcaba both fired. The latter testified that he fired only one round towards a fence in the direction of the fleeing rivals. Martinez was killed in this exchange of gunfire.

A police investigation indicated Mr. Ruvalcaba's involvement, and two officers went to his residence.

Mr. Ruvalcaba's brother informed them that he was not there. The officers left, arrested Alvarez and Meneses, and then returned. No one answered the door at Mr. Ruvalcaba's residence so the officers left a business card. They learned that Mr. Ruvalcaba had a girlfriend, Diana Caguana, and they arrested Mr. Ruvalcaba at her residence at approximately 11:30 p.m. The police then returned to Mr. Ruvalcaba's residence to notify his parents of his arrest, but, when officers arrived there, no one was home and their business card remained in the door.

Mr. Ruvalcaba was placed in a police-station interview room and read his *Miranda* rights by the interrogating officers, Detectives William Moser and Albert Graf. A youth officer was not present initially, but one later arrived and was in the room during a brief conversation in which Mr. Ruvalcaba denied knowing anything about Martinez's murder. Detective Moser sent officers a second time to locate Mr. Ruvalcaba's parents, but again the officers were unsuccessful. Mr. Ruvalcaba participated in a lineup with Alvarez and Meneses just after midnight. Thereafter, Mr. Ruvalcaba was returned to the interview room; Detective Moser testified that he checked on the suspect through the night and asked Mr. Ruvalcaba whether he was hungry or needed to use the restroom. Detective Graf testified that he purchased food for Mr. Ruvalcaba and the other suspects at approximately 3 a.m. and 8:30 a.m.

Diana Caguana, Mr. Ruvalcaba's girlfriend, along with the couple's infant child, arrived at the station sometime that morning. At approximately 9 a.m., Detective Moser and a youth officer were present while the assistant state's attorney, Thomas Biesty, again issued *Miranda* warnings and questioned Mr. Ruvalcaba. He denied knowledge of the murder. At approximately 10 a.m., Detective Moser took a picture of Caguana and the baby; the detective testified that

he took the picture at Mr. Ruvalcaba's request to prove to Mr. Ruvalcaba that Caguana was present at the station, but Mr. Ruvalcaba denies knowing that she was there. Detective Moser testified that he allowed Caguana to speak to Mr. Ruvalcaba at 11 a.m. Mr. Ruvalcaba denies that the visit took place. Indeed, Mr. Ruvalcaba testified that Detective Moser showed him the picture of Caguana and the baby, and told him to confess or Detective Moser would "get [Caguana] and get the truth out of her. And if she tried lying [Detective Moser would] make sure he put her in jail and take the baby, and make sure the baby ended up in D.C.F.S." R.25 at C116.

At 11:30 a.m., Assistant State's Attorney Biesty again issued the *Miranda* warnings to Mr. Ruvalcaba and again questioned him in the presence of Detective Moser; the parties disputed whether the youth officer was present throughout the interview. Mr. Ruvalcaba claims that he received warnings but did not waive his *Miranda* rights. Mr. Ruvalcaba asked what Alvarez and Meneses were saying, and Biesty showed him that his codefendants had given statements. Mr. Ruvalcaba thereafter confessed to the events in the alley and gave a statement at 12:40 p.m. He claims that Biesty pressed him to conform the statement to those already rendered by Alvarez and Meneses. However, Mr. Ruvalcaba did not have access to his codefendants' statements while giving his own. At the end of his statement, Mr. Ruvalcaba said that he had been treated well, understood his rights and had not been given promises in exchange for the statement.

## B. State and Federal Proceedings

### 1. State Trial

Mr. Ruvalcaba was charged with first degree murder in the death of Martinez and with the attempted first degree

murder of Flores and Sanchez. Before trial, he sought to suppress the confession on the grounds that the police had failed to notify his parents of his arrest, that he did not intelligently waive his right to an attorney after police told him that he did not need one and that officers coerced him into making a statement. The trial court heard testimony from the officers and Mr. Ruvalcaba and denied his suppression motion,

> basing its determination on the witnesses' credibility. The court found that the officers had substantially complied with the requirements contained in the Juvenile Court Act. The court further found that [Mr. Ruvalcaba] had not been subjected to intense psychological pressures and had voluntarily given his statement after being advised of his constitutional and juvenile rights.

R.8, Ex.B (Opinion of Appellate Court of Illinois) at 9.

After the denial of his suppression motion, Mr. Ruvalcaba was tried before a jury and relied upon a claim of self-defense. The jury acquitted Mr. Ruvalcaba of the attempted murder of Sanchez, but could not reach a verdict on the other charges. He was tried a second time. The second jury found Mr. Ruvalcaba guilty of the first degree murder of Martinez and the attempted murder of Flores.


### 2. State Appellate Proceedings

Mr. Ruvalcaba appealed to the Appellate Court of Illinois; he argued, among other grounds, that his confession was involuntary and that he had been denied due process of law because of prosecutorial misconduct during the assistant state's attorneys' closing arguments. The court affirmed his conviction in an unpublished opinion. R.8, Ex.B.

**a.**

The appellate court rejected Mr. Ruvalcaba's contention that the trial court erred in denying the motion to suppress his confession. Mr. Ruvalcaba had sought suppression on the ground that he had been questioned without his parents present and had made a statement under coercion. Considering the totality of the circumstances and taking special care because Mr. Ruvalcaba was a minor, the court noted that certain factors, such as Mr. Ruvalcaba's age, his lack of experience with the criminal justice system, and the alleged threats against his girlfriend and child, supported a determination of involuntariness.

On the other hand, the appellate court continued, several factors supported the conclusion that Mr. Ruvalcaba's statement was voluntary. Notably, he had raised the alleged threats for the first time on appeal and never had mentioned the threats in his statement or trial testimony; he had offered no evidence to corroborate his claim to have been psychologically or physically coerced; he had been fed and was allowed to use the restroom, and he said in his statement that he had been treated well by the police; he acknowledged at every stage that he understood his rights; he did not have access to any codefendants' statements when giving his confession and had not argued at trial that he was forced to change his statement to conform with the statements of the other arrestees. Moreover, the appellate court noted certain personal traits of Mr. Ruvalcaba that indicated that his statement had not been involuntary. For example, he was a high school student of at least average apparent intelligence and was an admitted gang member who was presumably "streetwise." R.8, Ex.B at 21.

The court also noted that, although Mr. Ruvalcaba was detained for up to thirteen hours, he was interrogated only three times, for intervals ranging from only a few seconds

to forty-five minutes. The appellate court finally determined that the police had complied with Illinois' Juvenile Court Act by calling a youth officer shortly before Mr. Ruvalcaba arrived at the station and by making a "reasonable attempt to notify" Mr. Ruvalcaba's parents. 705 ILCS 405/5-405. The appellate court accordingly held that the totality of the circumstances indicated that Mr. Ruvalcaba offered his confession voluntarily.

**b.**

The state appellate court also rejected Mr. Ruvalcaba's prosecutorial misconduct claims. Mr. Ruvalcaba had argued that an assistant state's attorney offered an incorrect statement of law by informing the jury that first degree murder required the State to prove only two elements, the mens rea and the actus reus, and by subsuming the third element, lack of justification, into the requirement for second degree murder. Under Illinois law, the substantive offense of first degree murder requires that the State prove that the defendant lacked justification. Mr. Ruvalcaba contended that the prosecutor's misstatements had the effect of placing the burden on him to prove that the killing was justified.

The appellate court held that, taken in context, the prosecutor's statements "merely describ[ed] the process involved in determining whether defendant was guilty of either first degree murder or second degree murder" and did not improperly shift the burden to Mr. Ruvalcaba. R.8, Ex.B at 33. The court held, in the alternative, that the trial court's instructions to the jury, which included the elements and the burden of proof, cured any prejudice resulting from the statements.

Mr. Ruvalcaba also argued that an assistant state's attorney's comments in rebuttal shifted the burden of proof by stating that Mr. Ruvalcaba was attempting to put the State's

witnesses on trial. The appellate court found this argument unpersuasive because Mr. Ruvalcaba's counsel invited the comments in his own closing statement.

The Supreme Court of Illinois denied a petition for leave to appeal.

### 3. Federal Habeas Proceedings

Mr. Ruvalcaba then timely filed a federal petition for habeas corpus. *See* 28 U.S.C. § 2254. His petition raised four claims of error, only two of which have been appealed to us.

First, he submitted that the appellate court's decision was contrary to and an unreasonable application of the Supreme Court's guidance for evaluating juvenile confessions as established in *Fare v. Michael C.*, 442 U.S. 707 (1979), and applied in *Hardaway v. Young*, 302 F.3d 757 (7th Cir. 2002).

The district court rejected this argument because neither *Fare* nor *Hardaway* established a per se rule of involuntariness in evaluating a minor's confession, but rather held that youth is one factor in a totality of the circumstances analysis. Given this standard, the district court held that the appellate court's analysis was not an "unreasonable application" of *Fare* because it adequately considered Mr. Ruvalcaba's age as well as other circumstances.

Mr. Ruvalcaba also renewed his claim of prosecutorial misconduct. The district court evaluated the submission that he had raised before the state appellate court and rejected his claim for relief.

The district court granted Mr. Ruvalcaba a certificate of appealability on his involuntary confession claim. After Mr. Ruvalcaba filed his appeal, a certificate of appealability was issued for his additional claim of prosecutorial misconduct.

## II

## DISCUSSION

### A. Standard of Review

We review the district court's denial of a petition for habeas relief de novo. *Barrow v. Uchtman*, 398 F.3d 597, 602 (7th Cir. 2005). A petition for a writ of habeas corpus by an individual incarcerated pursuant to a state court judgment "shall not be granted . . . unless the adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The state appellate court's findings of fact are presumed correct. That presumption may be rebutted only by clear and convincing evidence. *Id.* § 2254(e); *Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000).

Mr. Ruvalcaba grounds his appeal on both the "contrary to" and the "unreasonable application" prongs of § 2254. A state court decision is "contrary to . . . clearly established Federal law" when the court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 406 (2000). An "unreasonable application of[ ] clearly established Federal law" results when a court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. "This reasonableness determination is quite deferential, such that a state decision may stand as long as it is objectively reasonable, even if the reviewing court determines it to be substantively incorrect." *Uchtman*, 398 F.3d at 602. We presume the state court's factual determinations to be correct, unless Mr. Ruvalcaba rebuts that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## B. Involuntary Confession

Mr. Ruvalcaba first asserts that the state appellate court acted contrary to and unreasonably applied Supreme Court precedent when it determined his confession to be voluntary. He notes that the record must be scrutinized with care in cases involving a juvenile's confession, and he claims that the state court did not exercise that care in evaluating his statements. He argues that the totality of the circumstances, but particularly his youth, indicates that police coercion over the course of a long interrogation overcame his sixteen-year-old will to resist. Consequently, Mr. Ruvalcaba argues, the admission of his statement violated his rights under the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

At the outset, Mr. Ruvalcaba challenges several of the state court's factual findings. *See* 28 U.S.C. § 2254(d)(2). In particular, he disputes that police interrogated him only three times while he was in custody and that he understood the *Miranda* warnings. However, he offers no evidence beyond his own assertions to refute the evidence from officers that he was interrogated three times. In short, he fails to offer the clear and convincing evidence necessary to rebut the statutory presumption that the state court's factual findings are correct. Similarly, he offers no evidence at all to rebut the officers' testimony that he appeared to understand the *Miranda* warnings. Accordingly, we must accept the state court's factual determinations. *See id.* § 2254(e)(1). Furthermore, the state trial court's factual determinations largely were based on its view of the credibility of the witnesses. "Federal courts do not reevaluate the credibility of witnesses when conducting habeas review of state trials." *Stone v. Farley*, 86 F.3d 712, 718 (7th Cir. 1996).

We turn now to a determination of whether the decision of the Appellate Court of Illinois can be characterized as "a

decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The applicable standard is established firmly in the jurisprudence of the Supreme Court: In evaluating whether a defendant offered a voluntary statement, a court must examine the totality of the circumstances surrounding the interrogation. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "This totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved." *Fare*, 442 U.S. at 725. In juvenile cases, the inquiry "includes evaluation of the juvenile's age, experience, education, background, and intelligence, and [considers] whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Id.*; *see also Hardaway*, 302 F.3d at 762. The Appellate Court of Illinois recognized that it was required to evaluate the totality of the circumstances surrounding Mr. Ruvalcaba's confession and undertook that task. R.8, Ex.B at 18. Therefore, the court was not acting "contrary to" clearly established law. *Hardaway*, 302 F.3d at 763.

Our next concern is whether the state court unreasonably applied Supreme Court precedent. As we already have noted, the voluntariness of a statement is determined "by considering whether, in light of the totality of the circumstances, the statement was the product of a rational intellect and free will," "or whether it was obtained by the authorities through coercive means," *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir. 1997) (citing *Mincey v. Arizona*, 437 U.S. 385, 398 (1978), and *Colorado v. Connelly*, 479 U.S. 157, 165 (1986)). Mr. Ruvalcaba's minority at the time is an important factor to consider, but his age alone does not render

the confession involuntary. *See Fare*, 442 U.S. at 725 (noting that the inquiry "*includes* evaluation of the juvenile's age" (emphasis added)). The Supreme Court in *Fare* held that a sixteen-year-old could make a statement intelligently and voluntarily, even without the presence of a friendly adult.[1] *See also Hardaway*, 302 F.3d at 763 ("[T]he mere absence of a friendly adult is by itself insufficient to require suppression of a juvenile confession.").

With respect to the other *Fare* factors, Mr. Ruvalcaba had reached his sophomore year in high school by the time of the offense, and there is no evidence that he was of abnormally low intelligence or otherwise was highly vulnerable. The trial court had an opportunity to assess his demeanor when he testified at the suppression hearing. Mr. Ruvalcaba admittedly had no previous experience with the criminal justice system, a fact that the appellate court noted in his favor. However, Mr. Ruvalcaba was an admitted gang member, and the district court cannot be said to have erred in presuming that he was "streetwise," a factor that reduces the importance of his lack of experience and indicates the capacity to appreciate his Fifth Amendment rights. *See Correll v. Thompson*, 63 F.3d 1279, 1291 (4th Cir. 1995) (noting that defendant was streetwise and thus was capable of understanding his rights and of giving a voluntary statement, despite an IQ of 68). In short, "[t]here is no indication that he was of insufficient intelligence to understand the rights he was waiving, or what the consequences of that waiver would be." *Fare*, 442 U.S. at 726.

In addition, there is relatively little evidence of official coercion in this case. Mr. Ruvalcaba was detained for up to

---

[1] There is no evidence that the youth officer actually assisted Mr. Ruvalcaba, and his presence therefore is of little import. *See Hardaway v. Young*, 302 F.3d 757, 765 (7th Cir. 2002).

fourteen hours, but the evidence shows that he was not interrogated repeatedly during this period and that he was questioned for a total of less than two hours over the course of three separate sessions. Nor is there evidence that he was denied food, rest or bathroom facilities during the period of his detention. Although he claimed that Assistant State's Attorney Biesty forced him to conform his statement to mirror those of his codefendants, the state trial court, basing its conclusion on its assessment of the witnesses' credibility, found that Mr. Ruvalcaba gave his statement before he was informed in any way of the substance of his codefendants' statements.

The only evidence of coercion that Mr. Ruvalcaba offered was the alleged threat to his girlfriend and child. *See Johnson v. Trigg*, 28 F.3d 639, 643 (7th Cir. 1994). The state trial court appraised this story when it made credibility findings and concluded that Mr. Ruvalcaba's will was not overborn by intense psychological pressure at the time he confessed. In sum, the Appellate Court of Illinois reasonably applied the standard set forth by the Supreme Court in *Fare* for evaluating a juvenile confession.

## C. Waiver of *Miranda* Rights

Mr. Ruvalcaba's submissions may be construed as independently challenging the state court's determination that he voluntarily waived his right to remain silent and to have counsel present during his interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). In evaluating whether a suspect voluntarily waived his *Miranda* rights, we consider the same factors that we considered above in assessing the overall voluntariness of a confession. *See United States v. Huerta*, 239 F.3d 865, 873 (7th Cir. 2001) ("Factors considered in the analysis include the defendant's background, experi-

ence, and conduct."). Any argument that Mr. Ruvalcaba
involuntarily waived his *Miranda* rights would "reiterate the
identical factual assertions that the district court rejected
with respect to h[is] voluntariness claim." *Id.* The state
court's determination that Mr. Ruvalcaba voluntarily
waived his rights is compatible with the standards enunci-
ated by the Supreme Court of the United States.


## D. Prosecutorial Misconduct

Mr. Ruvalcaba further submits that he was denied a fair
trial through prosecutorial misconduct. He alleges that the
state's attorneys misstated the law to the jury and improp-
erly shifted the burden of proof.[2] Although his submissions

---

[2] In his submissions to this court, Mr. Ruvalcaba enclosed por-
tions of the state trial record that were not before the district
court. *See* Appellant's Supplemental App. 5. In particular, he
seeks to include a small portion of the State's rebuttal argument
and the trial court's jury instructions. The State has moved to
strike Appendix 5 as a violation of Federal Rule of Appellate
Procedure 10(a); in the alternative, the State invites us to consider
the entirety of the instructions in Appendix 5, which it believes
bolsters the state appellate decision, rather than just the portions
that Mr. Ruvalcaba cites.

The material submitted as Appendix 5 was not before the
district court, and we generally decline to supplement the record
on appeal with materials that were not before the district court.
*See Shasteen v. Saver*, 252 F.3d 929, 935 n.2 (7th Cir. 2001). The jury
instructions are helpful to this court in evaluating the state ap-
pellate decision and, for reasons discussed below, ultimately do
not support Mr. Ruvalcaba's position. In the interest of comple-
tion, therefore, we have considered the materials submitted as
Appendix 5 and view them in their entirety.

(continued...)

to this court do not specify the challenged statements, we understand Mr. Ruvalcaba's claim to assert the same error that he argued before the state courts.

In Illinois, lack of justification is an element of the offense of first degree murder that must be proved by the State. 720 ILCS 5/9-1(a) ("A person who kills an individual *without lawful justification* commits first degree murder if . . . ." (emphasis added)). The defendant bears the burden of proving, by a preponderance of the evidence, a mitigating factor such as self-defense to reduce the offense to second degree murder. When such a defense is raised, "[t]he State still bears the burden to prove, beyond a reasonable doubt, the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the killing that would justify or exonerate the murder." *People v. Jeffries*, 646 N.E.2d 587, 591-92 (Ill. 1996).

In her closing statement, an assistant state's attorney told the jury:

------

(...continued)

The jury instructions are not the only portion of the trial record that is absent from the record here. Indeed, Mr. Ruvalcaba's prosecutorial misconduct argument was not developed before the district court, which apparently gave him the benefit of the doubt by considering the argument as raised before the state appellate court. Mr. Ruvalcaba challenges certain statements made by the prosecutors, but the applicable pages of the trial record are not enclosed. Instead, Mr. Ruvalcaba cites to his brief before the state court, which in turn cited portions of the transcript not before this court. *See* Reply Br. at 8 (citing R.8, Ex.A at 57 (citing Tr.17 at U82-85)). The parties do not dispute Mr. Ruvalcaba's transcription of the record, and the state appellate court also quoted the challenged statements. *See* R.8, Ex.B at 30-32. We therefore have considered the statements that he challenges despite their absence from the record.

[The judge] will instruct you, Ladies and Gentlemen, that to sustain the charge of first degree murder, . . . the State must prove the following propositions, that the defendant or for one for whose conduct [he] is legally responsible, . . . the accountability language, . . . perform[ed] the acts which cause[d] the death of Hiram Martinez.

Second, that when the defendant or for one for whose conduct he is legally responsible did so intend to kill or do great bodily harm to Hiram Martinez or he knew that such act would cause death to Hiram Martinez or you know that such an act created a strong probability of death or great bodily harm to Hiram Martinez.

. . . [T]here are two propositions here in order for the . . . charge of first degree murder in this case, Ladies and Gentlemen. We have proven each and every one of them. First, that the defendant or one for whose conduct he is legally responsible performed the acts which caused the death.

We know that is what happened. We know that shooting in the alley caused the death of 17-year-old Hiram Martinez, the second proposition which give you three separate propositions. We have proven each and every one of those.

When you fire a 9 millimeter handgun and a .32 caliber weapon into the direction of two living human beings, what else could you possibly intend except to cause death or great bodily harm.

Ladies and Gentlemen, this is like a road map. Ladies and Gentlemen, we have proven first degree murder.

. . . .

> The Judge will also struck [sic] you, Ladies and Gentlemen, as to the law of second degree murder, and that would be the third proposition that you will read on this instruction.

> The third proposition states that the defendant or one for whose conduct he is legally responsible was not justified in using the force in which he used.

> [Defendant] was not justified in using the force in which he used. He was not justified in using that force by his own admission, . . . that nobody had a gun in the alley, that he went into enemy territory, Ladies and Gentlemen, as aggressor looking for revenge.

> Don't let this fool you, Ladies and Gentlemen, the only way to get to this third point is for the defense to show mitigating factor language. There is [sic] no mitigating factors.

R.8, Ex.B at 30-32; *see also* R.8, Ex.A at 57-58. The trial court sustained an objection to this last point and instructed the jury to disregard it. R.8, Ex.A at 58.

In the State's rebuttal, another assistant state's attorney added:

> [Defendant] wants to get out from underneath the crushing, damning evidence of his guilt? Well, you saw it over the last few days, Ladies and Gentlemen. He tries to shift the spotlight over to the police, put the witnesses on trial, try to put the assistant state's attorney from review on trial. It is called a defense of desperation.

> [Objection sustained]

> . . . They never told us what to do in law school when the law is not on your side and when the evidence is not

on your side. Well, you got to see it first hand over the last few days. What you do is come up with the Alejandro Ruvalcaba defense that puts everybody else on trial.

[Objection overruled]

R.8, Ex.A at 58; *see also* R.8, Ex.B at 35-36.

The trial court instructed the jury in relevant part:

To sustain a charge of first degree murder or charge of second degree murder, the State must prove the following propositions: First, that the defendant or one for whose conduct he is legally responsible performs the act which caused the death of Hiram Martinez. And, second, that when the defendant or one for whose conduct he is legally responsible did so. He attempted to kill or do great bodily harm to Hiram Martinez or he know [sic] that such acts would cause the death to Hiram Martinez or he knows such acts created a strong probability of death or great bodily harm to Hiram Martinez and, third, that defendant or one for whose conduct he is legally responsible was not justified in using the force which he used.

. . . .

You should not consider whether the defendant is guilty of a lesser offense of second degree murder until and unless you have first determined the State has proved beyond a reasonable doubt each of the previously stated propositions.

The defendant has the burden of proving by a preponderance of the evidence that mitigating factor was present so that he is guilty of the lesser offense of second degree murder instead of first degree murder.

> By this I mean you must be persuaded considering all the evidence in the case that it is probably more true than not true that the following mitigating factors are present: That the defendant at the time he performed the acts which caused the death of Hiram Martinez believed the circumstances would be such that they justified deadly force he used was believed that such circumstances exists—was reasonable.

> If you find from your consideration of all the evidence the defendant has proved by preponderance of the evidence that a mitigating factor is present so that he is guilty of the lesser offense of second degree murder instead of first degree murder, you should find the defendant guilty of second degree murder.

Appellant's Supplemental App. 5 at 152-55.

Mr. Ruvalcaba argued that the state's attorneys' statements, together with the jury instructions, shifted to him the burden of proving lack of justification. The state appellate court rejected this contention, holding that the prosecutors' statements were proper because they merely described the process by which an Illinois jury was to determine guilt of first or second degree murder, and responded to Mr. Ruvalcaba's attempts at trial to discredit State witnesses. Moreover, the appellate court held that the trial court's instructions to the jury cleared any confusion regarding burdens of proof.

Mr. Ruvalcaba asserts that the appellate court's decision was contrary to or an unreasonable application of federal law. He notes that the evidence against him was not overwhelming, as indicated by the first jury's failure to reach a verdict. He further notes that the trial court garbled Illinois' pattern jury instruction. Specifically, Mr. Ruvalcaba claims that the trial court articulated a confusing direction about

whether he bore the burden of establishing self-defense before the jury could find second degree murder: "the defendant at the time he performed the acts which caused the death of Hiram Martinez believed the circumstances would be such that they justified deadly force he used was believed that such circumstances exists—was reasonable." Appellant's Supplemental App. 5 at 154. At another point, in discussing the elements of first degree murder, the state trial court substituted the word "attempted" for the proper term, "intended." Appellant's Supplemental App. 5 at 153. The confusing instructions, according to Mr. Ruvalcaba, also exacerbated the prosecutors' misstatements.

A claim of prosecutorial misconduct must be evaluated according to the framework established by the Supreme Court in *Darden v. Wainwright*, 477 U.S. 168 (1986). The court first looks to the challenged comments to determine whether they were improper. If the comments were improper, the court then evaluates whether the defendant was prejudiced by the comments. It accomplishes this task by considering six factors: "(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut." *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000); *see Darden*, 477 U.S. at 181-82. In determining whether the prosecutors' remarks were prejudicial, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotations and citations omitted).

Although the state appellate court did not cite *Darden*, it applied the correct standard. The court principally con-

cluded that the prosecutors' comments were not improper under *Darden*'s first prong. Although we might not be as charitable if we were reviewing the matter as one of first impression, we would be hard-pressed to say that the Appellate Court of Illinois' characterization of the prosecutors' statements was unreasonable. In any event, the trial court's action in sustaining the defense's objection to one aspect of the prosecutors' remarks went a long way toward curing any problem.

The appellate court had no occasion specifically to address *Darden*'s second prong. Nevertheless, we find adequate consideration of the second-prong factors throughout the court's opinion. The appellate court evaluated, among other considerations, whether the prosecutors misstated evidence and whether the trial court's instructions were correct. *See Hough v. Anderson*, 272 F.3d 878, 903 (7th Cir. 2001) (finding sufficient the state court's consideration although "[t]he Supreme Court of Indiana did not recite with precision the factors set forth in *Darden*").

Thus, even if we were to assume that the State's arguments were improper under *Darden*'s first prong, we cannot say that the state appellate court unreasonably applied *Darden*'s second prong when it determined that the statements did not prejudice Mr. Ruvalcaba because the trial court's jury instructions adequately set forth the applicable burdens of proof and the elements of the offenses. The trial court's instructions to the jury correctly stated the elements and burdens of proof for first degree murder. The trial court instructed the jury that "[t]he State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and this burden remains on the State throughout the case." Appellant's Supplemental App. 5 at 149. It then reiterated that

> [t]o sustain a charge of first degree murder or charge of second degree murder, the State must prove the following propositions: First, that the defendant . . . performs the act which caused the death of Hiram Martinez. And, second, that when the defendant . . . did so[,] [h]e attempted to kill or do great bodily harm to Hiram Martinez . . . *and, third, that defendant . . . was not justified in using the force which he used.*

Appellant's Supplemental App. 5 at 152-53 (emphasis added). It is assumed that the jury followed the trial court's instructions, *Bae v. Peters*, 950 F.2d 469, 481 (7th Cir. 1991), and it was not unreasonable of the state appellate court to determine that this instruction sufficiently cured any error in the prosecutors' closing statements.

Furthermore, we do not believe that the trial court's use of the term "attempted" rather than "intended" in the second element constituted prejudicial error. Although the court first stated the scienter requirement as a showing that Mr. Ruvalcaba "*attempted* to kill or do great bodily harm to Hiram Martinez," the court continued: "or he *know* [sic] that such acts would cause the death of Hiram Martinez or he *knows* such acts created a strong probability of death or great bodily harm to Hiram Martinez." Appellant's Supplemental App. 5 at 153 (emphasis added). Considering the instruction as a whole, it was clear to the jury that the second element required a showing that Mr. Ruvalcaba *intended* to kill rather than *attempted* to kill.

Nor do we believe that the trial court's instruction regarding the mitigation factor of self-defense was so confusing as to exacerbate any impact on the jury from the prosecutors' comments. The Illinois court was entitled to conclude that, taken in context, this instruction adequately conveyed the mitigation factor to the jury. Notably, after the passage upon

which Mr. Ruvalcaba focuses, the state trial court then continued with, and correctly stated, the standard: "If you find from your consideration of all the evidence the defendant has proved by preponderance of the evidence that a mitigating factor is present . . . you should find the defendant guilty of second degree murder." Appellant's Supplemental App. 5 at 154-55. We cannot say that these instructions render unreasonable the Appellate Court of Illinois' view that the instructions were not so confusing that they denied Mr. Ruvalcaba a fair trial.

Further consideration of the second-prong *Darden* factors demonstrates that Mr. Ruvalcaba suffered no prejudice from the challenged statements. For instance, Mr. Ruvalcaba does not claim, nor is there any evidence, that the state's attorneys misstated the evidence against him. Moreover, the evidence against Mr. Ruvalcaba was more than ample: He was an admitted gang member; he and Meneses were looking for rival gang members to avenge an act of vandalism; he armed himself before walking into the alley and admitted to shooting in the direction of fleeing rivals during the fatal altercation. Considering all of these factors, we cannot say that the state appellate court's determination that Mr. Ruvalcaba suffered no prejudice was contrary to, or involved an unreasonable application of, *Darden*.

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*