In the

# United States Court of Appeals
## For the Seventh Circuit

No. 04-4096

MICHAEL E. DAVIS,

*Plaintiff-Appellant,*

*v.*

CHARLES NOVY, individually and in his capacity
as a Bolingbrook, Illinois, police officer for the Village
of Bolingbrook, and LUIS ESCOBAR, individually and
in his capacity as a Bolingbrook police officer for
the Village of Bolingbrook,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 572—**Arlander Keys**, *Magistrate Judge.*

ARGUED SEPTEMBER 22, 2005—DECIDED JANUARY 6, 2006

Before EASTERBROOK, EVANS, and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* In this case, brought under
42 U.S.C. § 1983, Michael Davis alleges that two police
officers from the Village of Bolingbrook, Illinois, violated his
rights under the Fourth Amendment by stopping his truck
without probable cause and searching it and his home
under the authority of a written "consent to search" he was
coerced into signing. The officers insist that
Davis voluntarily consented to the searches and that
an obscured registration sticker on his license plate sup-

plied probable cause for the stop. After 3 days of trial before a jury, Magistrate Judge Arlander Keys (presiding with the parties' consent, *see* 28 U.S.C. §636(c)(1)) granted the defendants' motion for judgment as a matter of law, finding that the evidence left no doubt about the validity of Davis's consent and that probable cause for the stop was unquestionably present.

The officers, Charles Novy and Luis Escobar, were investigating an anonymous 9-1-1 telephone call about a man in a black truck taking pictures of a little girl who was walking on a sidewalk with her father. The caller also told the police dispatcher of another incident in the same area involving an individual taking pictures of girls after school. While Escobar was trying to find other information about the call, Novy spotted Davis's truck. It wasn't a perfect match—Davis's truck was dark green— but it was close, so Novy decided to follow while waiting for further word from Escobar. Novy testified that as he was following the truck, he saw that the registration sticker—displaying the month of issuance on the Illinois license plate—was obscured, in violation of state law. *See* 625 ILCS 5/3-413(b). He decided to pull Davis over to look into the matter.

When Novy walked up to the truck's window, Davis asked about the reason for the stop: "I asked him . . . did I commit some sort of traffic violation or traffic infraction." According to Davis, Novy replied "no" and told him about the 9-1-1 call. Naturally, Davis was troubled by the suggestion implicit in the call—that he might be some sort of a pedophile. (There is absolutely nothing in the record to suggest that Davis is in any respect a bad guy.) Davis was concerned, however, because he was in fact taking pictures that day, though not of children. Rather, he was trying to document a problem with Bolingbrook's snowplowing which, on this February day, left piles of snow blocking the sidewalks. Why was he concerned? He uses a wheelchair, and

the snow piles made it difficult for him to get around.[1]

Davis had his camera with him in the truck, and the camera bag was plainly visible in the truck's cab. When Novy saw the camera bag, he become more convinced that he had found the truck he was looking for. He asked Davis for his driver's license and proof of insurance, which Davis didn't have. And Davis's driver's license was from Indiana. Davis explained that he had moved to Illinois some 6 months before and had not yet obtained an Illinois driver's license. Illinois law requires that an Illinois driver's license be obtained within 90 days of a driver's move into the state. *See* 625 ILCS 5/6-102(7).

Other items Novy saw in the cab—rope, duct tape, and towels covering the upholstery—heightened his suspicions. Concerned that he might have a kidnapper (or a possible crime involving children) on his hands, he asked Davis for permission to search the vehicle. Davis says that when he asked Novy what would happen if he refused, Novy told him that because he had no valid driver's license or proof of insurance, his truck would be impounded and he would be taken to jail. *See* 625 ILCS 5/6-101(d). Worried that he would be unable to get by without his truck, Davis consented. He got out of the truck and waited with Officer Escobar (who had by then arrived on the scene) while Novy looked around the cab. The search turned up additional, perhaps suspicious, items: a ticket stub from a children's zoo, court documents from South Dakota, and an unusual article of clothing— women's thong underwear—behind the driver's seat.

---

[1] Although fairly described as a "wheelchair-bound person," Davis is, it appears, able to do some walking. At one point during the encounter, he exited the truck and walked to its rear without assistance.

At this point, Novy felt that further investigation was warranted. He conferred with Escobar and decided to ask Davis for permission to search his house. He presented Davis with a fairly standard police "consent to search" form, which Davis signed. The three of them then went to Davis's house, where Novy conducted the search. Finding nothing of concern, Novy ended the encounter by writing Davis up for three vehicle-code violations: having no valid driver's licence, operating an uninsured vehicle, and displaying an obscured registration sticker. The whole encounter between Davis and the officers lasted 2 hours.

Davis eventually sued Officers Novy and Escobar. He claimed that the initial traffic stop was illegal because the officers lacked probable cause to believe that he had committed, or was committing, an offense. On this point, the district court decided, and neither party disagrees, that the anonymous tip was an insufficient basis for the stop—not only was it uncorroborated, *see Florida v. J.L.*, 529 U.S. 266, 270 (2000); *United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005), but it didn't describe anything illegal. (Taking drive-by photos of children may be suspicious, but by itself it isn't against the law.) And the officers did not learn that Davis had an invalid driver's license and no proof of insurance until after the stop.

That leaves the registration sticker on Davis's license plate. If, as Novy asserts, he saw the obscured sticker while following Davis, he had probable cause to pull him over for a violation of the vehicle code, even if the real reason for the stop was to investigate the anonymous 9-1-1 call. *See Whren v. United States*,[2] 517 U.S. 806, 813 (1996) (officer's subjective motive irrelevant to reasonableness of traffic stop);

---

[2] *Whren* is the seminal case on traffic stops. Strangely, it is not cited by Davis.

*United States v. Rogers*, 387 F.3d 925, 934 n.9 (7th Cir. 2004). But Davis claims that Novy didn't see the obscured sticker until later (though he admits that the sticker was in fact obscured). He relies on three pieces of circumstantial evidence: (1) when Davis asked about the reason for the stop, Novy didn't mention the obscured sticker but instead told him about the child-picture-taking complaint; (2) Novy didn't stop him as soon as he allegedly saw the obscured sticker; (3) the transcript of the radio communications among Novy, Escobar, and the dispatcher contains no mention of an obscured sticker.

Like Magistrate Judge Keys, we do not believe that this evidence seriously calls into question whether Novy saw the obscured sticker before stopping Davis's truck. It is undisputed that Novy followed Davis's truck for about a half a mile before signaling him to pull over. We cannot imagine that Novy did not look at the truck's rear license plate during that time. After all, that's what police officers do when following a vehicle. Also, the fact that Novy didn't stop Davis immediately upon seeing the sticker means little—police are not required to make their move at the first sign of an offense, and in this case it was reasonable for Novy to wait and see if any further information was forthcoming from Officer Escobar. Nor is it unexpected that an officer will hold back from telling a motorist all of his reasons for initiating a stop. Simply put, Davis does not dispute that the sticker was obscured, and he has not presented sufficient evidence to persuade a rational factfinder that Novy did not see it before the stop as he testified.

Davis also claims that he was coerced into consenting to the search of his truck and his home. The voluntariness of a consent to search is judged by the totality of the circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 229 (1973); *Ruvalcaba v. Chandler*, 416 F.3d 555, 560 (7th Cir. 2005). Davis's argument rests primarily on two

circumstances. First, the nature of the allegation: under suspicion of possible pedophile-like behavior, his choice was to cooperate or risk an unbearable stigma. But if grave accusations were inherently coercive, as this argument suggests, then a valid consent would be impossible to obtain in connection with any serious offense.

Davis identifies a second circumstance which is more specific: Novy's declaration that if Davis did not consent to the searches, his truck would be impounded and he would be taken into custody. But this wasn't a baseless threat: the Illinois Vehicle Code directs that a driver who is lacking both license and insurance "shall have his or her motor vehicle immediately impounded by the arresting law enforcement officer." 625 ILCS 5/6-101(d). We asked the parties at oral argument whether this provision imposes a binding obligation on the arresting officer to impound the vehicle. They have not called our attention to any authoritative interpretation on the point by Illinois courts. But the best, and we suggest the most common-sense understanding of the statute, is that an officer can exercise discretion on whether a vehicle should be impounded. After all, if impounding of vehicles under all circumstances was required, a small village like Bolingbrook (population 40,843) could very well be overrun with impounded cars.

Whether mandatory or discretionary, the statute authorized Novy to impound Davis's truck. And given what Novy was faced with—a report of suspicious photo-taking; a driver with an out-of-state license carrying rope, duct tape, towels, and ladies' underwear in his truck—it was reasonable for him to use the tools available to him to investigate further. One way would have been to impound the vehicle and perform the search when the truck was in custody. Another way was to obtain Davis's consent. He gave Davis a reasonable choice, and we can't conclude that Novy's offer was coercive. And, it is important to note, Davis got exactly what he hoped to get by consenting:

He was not arrested and his truck was not impounded. The fact that Novy apparently elected not to enforce the Illinois law to its fullest doesn't mean Davis's consent was illegally obtained. It would be different, of course, if the threat of arrest and/or impoundment of the truck was unauthorized by state law. In that case, Novy would have obtained a consent with an empty threat, and the result would be different.

Finally, although the stop here was permissible with probable cause under *Whren*, it could be argued that the information available to Novy might well have justified a brief investigatory stop based on reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968). Given that we live in a time of increasing crimes against children— what with "Amber Alerts" and all—the limited intrusion of a brief traffic stop under circumstances like those present in this case cannot be easily labeled as unlawful.

We agree with the district court that no reasonable jury could find that Novy lacked probable cause to stop Davis or that Davis's consent to the search of his truck and his home was legally coerced. We therefore AFFIRM the court's judgment.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*